THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
EDWARD SPICER, Defendant-Appellant.

Fifth District   No. 76-392

Opinion filed May 11, 1978.

KARNS, J., dissenting.

Michael J. Rosborough and Randy E. Blue, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Clyde L. Kuehn, State's Attorney, of Belleville (Bruce D. Irish and Keith P. Vanden Dooren, both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. PRESIDING JUSTICE EBERSPACHER delivered the opinion of the court:

Defendant, Edward Spicer, was charged in the circuit court of St. Clair County with two counts of murder, one count of attempted murder and one count of armed robbery. Pursuant to a change of venue, a jury trial was had in Randolph County following which defendant was found guilty as charged. Defendant brings this appeal from the judgment entered and he raises the following issues: (1) whether the trial court erred in determining that defendant was not entitled to other appointed counsel, where the public defender represented defendant and a co-defendant, James Phillips, who had been previously convicted and sentenced on the same charges and was called as a State's witness; (2) whether it was error to admit in evidence a prior statement by Phillips in

lieu of direct examination of him; (3) whether it was error to admit in evidence a tape recording of the robbery and murders, and a transcript thereof; and (4) whether it was error to admit in evidence certain photographs of defendant.

Jointly indicted with defendant were James Phillips and Earl Good. The public defender was appointed by the lower court for the three who were then each represented by separate assistant public defenders. The record shows that prior to the trial of defendant, James Phillips was tried before a jury, was found guilty as charged and was sentenced, and that in separate proceedings, Earl Good entered a plea of guilty to the two counts of murder.

The instant charges stem from the November 15, 1975, armed robbery of the Leading Food Store during which Ben Seigel and Emanuel Ukman, who were owners of the store, were killed by gun shots. During the course of the robbery, Police Officer Bruce Moore was also shot by one of the robbers but he survived.

At defendant's trial, Michael and Howard Owens testified detailing an audio surveillance system that continuously monitored and tape recorded sounds coming from within the Leading Food Store. Howard Owens stated that at 7:23 on the morning of November 15, 1975, he was informed of unusual activity in the store. He listened directly to the sounds in the store through a monitoring device and he alerted the police. The sounds of the occurrence were recorded on tape, which Owens stated, contained an accurate portrayal of that which he had heard. A chain of custody of the tape was also then established.

Vera Bolden, a teacher of oral language, who was working toward a master's degree in speech communications and who taught standard English to students with a black dialect, testified that she had compiled a transcript of the tape recording based upon listening to the tape approximately 25 times. Bolden further stated that there were four voices on the tape, two of which exhibited a black dialect. Copies of the transcript were distributed to the jury to aid in listening to the tape recording, and the tape was twice played. Thereafter the transcripts were collected and were not subsequently taken into the jury room.

Next a pathologist, Dr. Robert Sueper, testified that he had conducted autopsies on Ben Seigel and Emanuel Ukman and had determined that each had died of bullet wounds. Three bullets were identified as those taken from the body of Seigel and two bullets were identified as those taken from the body of Ukman. Of these five bullets, further evidence showed that two of them had been fired from a .38-caliber revolver which had been found in the home of James Phillips, the remainder of the bullets had been fired from another .38-caliber weapon.

Willie Staples testified that he lived across from the Leading Food Store

and that around 7 a.m. on November 15, 1975, he noticed a man in a vacant house next to the store. He described the man as tall and as wearing a black leather coat and hat. Staples was unable to identify the face of the man he saw and he stated that there may have been two people in the vacant house. Staples called the police and relayed his suspicions. After approximately 20 to 25 minutes had passed, Seigel and Ukman arrived at the store and Staples saw the man in the vacant house follow them. Staples first attempted to call the police, and then he changed his mind and tried to call the store, which he did after obtaining the number from a telephone operator. The phone in the store rang four to six times before it was apparently knocked off the hook. Staples stated that on the phone he heard "screams" as Seigle and Ukman were "struggling for their life." Subsequently, Staples saw Officer Moore apparently circling the exterior of the store on foot. Staples heard some shots, after which Moore shouted to him to call the police because he was shot.

Police Officer Moore testified that he had been dispatched to the Leading Food Store on the morning of the incident. After arriving at the scene, he observed someone whom he sought to pursue but lost. While reconnoitering the area, he saw two men inside the store wearing dark clothing. Moore had left his squad car near the north corner of the store and was now at the south corner, so he began running toward his car. At this point, a side door opened and an individual stepped out and fired one shot striking Moore in the neck. Moore was around 10 feet away from the individual. At trial he positively identified defendant as the one who shot him. He stated that he then returned three shots at defendant and subsequently he called for assistance.

Thomas McAleenan testified that at the time of the incident he drove past the scene on his way to work. He slowed his vehicle when he saw a policeman bearing a weapon. As he drove down the street, he heard a shot fired. He stopped and saw two men wearing black leather jackets exit a side door of the store. McAleenan saw a pistol in the hands of one of the men. The two men ran to a parked station wagon containing a third man who was sitting behind the wheel and the three then drove off. McAleenan then drove to a police station where he reported the license plate number of the station wagon.

The station wagon was owned by Lorrine Dixon who testified at trial that she had loaned the car to James Phillips on the evening of November 14, 1975, and that he returned the car on the morning of the following day.

A search of Phillips' house produced two black leather coats, $215 in one dollar bills, a .38-caliber revolver, and a red suitcase containing personal items and a camera containing film. The film was developed and consisted of photographs of defendant and Earl Good. There was further

testimony that defendant and Good had come to Phillips' house on a visit and that they had in their possession a suitcase and camera similar to those recovered in the search and that on the morning of the crime defendant, Good and Phillips had left Phillips' house together and had later returned.

James Phillips was called as a witness by the State and he identified a written statement as that which he had made to the police on the evening of November 15, 1975. Phillips testified that the statement was truthful, and then it was read to the jury. In it, Phillips stated that defendant and Good had arrived from Chicago on a visit on November 13, 1975. On the morning of the crime, according to Phillips, defendant and Good threatened harm to Phillips' two babies if he would not cooperate with them in the robbery of the food store. Phillips further stated that he drove them to the food store, he waited in the car for a half hour for them, and that when they returned, he drove them back to his house. He stated that he was given $300 as his share of the proceeds. Further, he stated that defendant and Good disappeared from his home at the time the police arrived.

Also introduced into evidence by the State was a statement by defendant wherein he acknowledged that he and Good had visited the home of Phillips around the time of the incident and he admitted that he had participated in the planning of the robbery. However, he denied that he had taken part in the robbery itself but stated that Good, Phillips and a "third party" had committed the crime.

On appeal defendant first contends that there existed a *per se* conflict of interest in the representation by the public defender of defendant because the public defender had also represented Phillips. Moreover, he argues that the trial court erred in denying his trial attorney's motion to withdraw because of this conflict. The State responds by arguing that the representation of defendant and Phillips by two separate assistant public defenders is not the equivalent of representation by a single attorney, and that the record shows that defendant received competent and vigorous representation and the undivided loyalty of his individual counsel.

James Phillips was represented at his trial by Assistant Public Defender Milton Wharton. Wharton also represented defendant at an arraignment, however, at trial defendant was represented by Assistant Public Defender Roger Hay. At a pretrial motion for a continuance by defendant, Hay stated to the court that he had been assigned to the case because of a conflict between Phillips and defendant in that Phillips claimed that he had been coerced to proceed with the crime. Nothing more was said of the conflict until the day of trial at which time Hay moved to withdraw as counsel and for appointment of counsel other than the public defender because the office of the public defender had previously represented Phillips, and Phillips was to be called as a witness by the State in the

upcoming trial. Defendant himself then stated: "There's no doubt, you know, that I could get proper representation [by Hay] but still due to the fact that Mr. Phillips had been tried previously already, he is constantly saying that he was forced under threat of his life being taken * * * I just can't see myself going to trial with a Public Defender because of the fact they might be leaning toward him * * * in his favor * * *." The State objected to the motion and argued that it was untimely, having been raised just prior to trial after there had been ample time to previously make the motion, and that there was no conflict since defendant and Phillips were represented by separate attorneys. The court denied the motion and trial began. During the course of the State's case-in-chief, Phillips was called as a witness but he refused to take the oath until he conferred with his attorney. At a subsequent in-chambers conference Wharton appeared on behalf of Phillips and argued that direct examination and cross-examination could elicit damaging admissions by Phillips that could be used at a future time if his convictions were reversed on appeal and the case retried. Additionally, Phillips expressed fear for his personal safety should he give direct testimony against defendant. In response, the State promised Phillips immunity from the use of any testimony he might give at trial. On this basis, the court cited Phillips for contempt but offered to dismiss the contempt should Phillips choose to testify. Thereafter Phillips was called as a witness and as previously mentioned, he identified a written statement he had made to the police. The State then offered the statement in evidence in lieu of direct testimony but subject to cross-examination on the contents thereof. Over defendant's objection, the statement was admitted and was read to the jury. Defendant's counsel Hay did not thereafter cross-examine Phillips.

■■ It is established that in Illinois, where a defense counsel's past or present commitments to others involves interests which potentially conflict with those of the defendant, a *per se* rule of reversal will be applied without the necessity of any showing of actual prejudice resulting thereby. *People v. Stoval,* 40 Ill. 2d 109, 239 N.E.2d 441; *People v. Kester,* 66 Ill. 2d 162, 361 N.E.2d 569; *People v. Coslet,* 67 Ill. 2d 127, 364 N.E.2d 67; *People v. Frey,* 50 Ill. App. 3d 437, 365 N.E.2d 283; *People v. Drysdale,* 51 Ill. App. 3d 667, 366 N.E.2d 394.

■■ We turn first to the question of whether defense counsel Hay can be charged with a "commitment" to Phillips merely by virtue of Hay's affiliation with the office of the public defender as an assistant public defender. The State stresses the fact that defendant and Phillips were each represented by a separate assistant public defender and further argues that it is an:

"* * * illogical premises that the Office of the Public Defender is

one, unified, indissoluble and indivisible whole and that the assistant public defenders are but mere alter-egos of the public defender, unable to participate in any act unfettered by the public defender himself."

We find the State's argument unpersuasive. Section 113—3(b) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1975, ch. 38, par. 113—3(b)), provides in part that:

"In all cases, except where the penalty is a fine only, if the court determines that the defendant is indigent and desire counsel, the Public Defender shall be appointed as counsel."

The statute then provides that the court "may" appoint counsel other than the public defender, as for instance, upon request by the defendant. Pursuant to the statutory provision, the record shows that the court below in fact appointed the public defender of the county to represent defendant and Phillips. Where the public defender is appointed to represent a defendant, it is he who is charged with the duty of acting as attorney on behalf of the defendant. (Ill. Rev. Stat. 1975, ch. 34, par. 5604.) However, for a proper discharge of the duties of his office, the public defender is empowered to appoint assistants who serve at his pleasure. (Ill. Rev. Stat. 1975, ch. 34, par. 5606.) But a defendant is not entitled to select a particular assistant to represent him. (*People v. Branscomb*, 116 Ill. App. 2d 385, 254 N.E.2d 126.) Assistant public defenders merely discharge the duties, responsibilities and obligations of the public defender and they remain answerable only to him (*People ex rel. Cook County v. Majewski*, 28 Ill. App. 3d 269, 328 N.E.2d 195), and he, in turn, remains responsible for the professional acts and conduct of his assistants (*People v. Dread*, 27 Ill. App. 3d 106, 327 N.E.2d 175). As stated in *People v. Benford*, 31 Ill. App. 3d 892, 895, 335 N.E.2d 106, 109:

"When the public defender of a county is appointed for an indigent in a criminal case, it is the office of the defender that is appointed. [Citation.] In legal contemplation, then, it is the public defender who is in court after he is appointed, although he may appear there through appointed assistants." See also *People v. Bain*, 24 Ill. App. 3d 282, 320 N.E.2d 426; *People v. Gray*, 4 Ill. App. 3d 934, 282 N.E.2d 189.

■■ In the case at bar, we cannot divorce Hay's representation of defendant from his affiliation with, and obligation to, the office of the public defender. (See *People v. Cross*, 30 Ill. App. 3d 199, 331 N.E.2d 643.) As an assistant public defender, he only functioned to discharge the duties of the public defender himself, and he was bound in so acting by the public defender's commitments to others. (*Cf. People v. Grigsby*, 47 Ill. App. 3d 812, 820, 365 N.E.2d 481, 486.) Since the public defender was appointed to represent both defendant and Phillips, we must take the

view as if but a single attorney had represented both clients. (*People v. Meng*, 54 Ill. App. 3d 357, 369 N.E.2d 549.) To hold otherwise would ignore the authority and responsibility of the public defender to act as attorney on behalf of defendants for whom he has been appointed.

We find support for such a view, particularly when considering a claimed conflict of interest, in *People v. Stoval*, 40 Ill. 2d 109, 239 N.E.2d 441, wherein the conflict arose in part because the defense counsel and his law firm represented potentially conflicting interests. As stated by the court:

> "[W]e believe that sound policy disfavors the representation of an accused, especially when counsel is appointed, by an attorney with possible conflict of interests. It is unfair to the accused, for who can determine whether representation was affected, at least, subliminally, by the conflict. Too, it places an additional burden on counsel, however conscientious, and exposes him unnecessarily to later charges that his representation was not completely faithful." (40 Ill. 2d 109, 113, 239 N.E.2d 441, 444.)

So too, where separate assistant public defenders each represent defendants with possible conflicting interests, such will cast a shadow on the loyalty of counsel, and the record may provide no measure upon which the subtle effect of the conflict may be discerned. See *People v. Meyers*, 46 Ill. 2d 149, 263 N.E.2d 81; *People v. Frey*, 50 Ill. App. 3d 437, 365 N.E.2d 283.

Turning next to whether a potential conflict of interest on the part of Hay is shown by the record, defendant contends that such is established by the fact that Phillips had been previously represented by the public defender, and that he was called at trial as a State's witness to give evidence against defendant. The State responds by arguing that the record shows no incompetency of counsel and no resulting prejudice. However, at issue is not the question of competency of counsel but of conflicts of interest. Furthermore, defendant, on appeal, bears only the burden of showing, from the record, facts giving rise to a potential conflict of interest on the part of his defense counsel; he need not show any prejudice resulting thereby. *People v. Stoval; People v. Kester; People v. Coslet.*

In *People v. Drysdale*, 51 Ill. App. 3d 667, 366 N.E.2d 394, this court held defense counsel *per se* in conflict of interest because the attorney had, three years previously, represented a State's witness in an involuntary commitment proceeding. Such gave rise to a potential conflict because the general subject matter of the attorney's prior employment was a proper subject of cross-examination and impeachment. Since the attorney was under a continuing obligation to the witness not to disclose any information given him in confidence, it was

held that the ability of the attorney to fully cross-examine the witness may have been limited.

In *People v. Halluin*, 36 Ill. App. 3d 556, 344 N.E.2d 579, this court reversed the defendant's conviction and remanded for a new trial upon facts showing that the defendant's appointed counsel had also represented a co-defendant who pleaded guilty, and after being sentenced, testified for the State against the defendant. Here again, it was held that there was the possibility that the attorney's commitment to the witness not to disclose any statements given him during their attorney-client relationship effectively limited the ability of the attorney to fully cross-examine the witness.

■■ Similarly, as in *Drysdale* and *Halluin*, in the case at bar the subject matter of Phillips' testimony was itself the very subject involved in the prior representation of Phillips. This fact alone is sufficient to invoke the application of the *per se* rule since there existed the possibility that Hay may have been in possession of confidential information given to the office of the public defender and may have been restrained in presenting a full cross-examination. Certainly other independent counsel, if in possession of such information, would have felt no ethical duty barring the full lawful use of such information to the advantage of defendant. That this possible conflict of interest existed is made more probable when consideration is given to two facts.

First, prior to trial, Hay himself, and defendant, specifically moved that Hay be given leave to withdraw and that counsel other than the public defender be appointed in his place. This motion was based on the prior representation of Phillips. As stated by the United States Supreme Court in *Holloway v. Arkansas* (1978), 435 U.S. 475, 55 L. Ed. 2d 426, 98 S. Ct. 1173, in holding that the sixth amendment right to effective assistance of counsel requires automatic reversal whenever a trial court improperly requires joint representation over timely objection:

> "[M]ost courts have held that an attorney's request for the appointment of separate counsel, based on his representations as an officer of the court regarding a conflict of interests, should be granted. [Citations.] In so holding, the courts have acknowledged and given effect to several interrelated considerations. An 'attorney representing two defendants in a criminal matter is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial.' [Citation.] Second, defense attorneys have the obligation, upon discovering a conflict of interests, to advise the court at once of the problem. [Citation.] Finally, attorneys are officers of the court and 'when they address the judge solemnly upon a matter before the court, their declarations are virtually made under oath.' (Citation.)

We find these considerations persuasive." (435 U.S. 475, 485-86, 55 L. Ed. 2d 426, 435, 98 S. Ct. 1173, 1179.)

In the instant case, that defense counsel, as well as defendant, perceived the possible conflict, and prior to trial raised the objection and presented a sufficient basis therefore, must be given strong weight.

Second, at trial when Phillips was called to the witness stand, Hay failed to cross-examine him at all, despite the highly damaging nature of the statement by Phillips which was admitted in evidence. Hay's failure to cross-examine Phillips under the circumstances "prompts an inquiry into counsel's motivation which ought never to be required." (*People v. Meyers*, 46 Ill. 2d 149, 152, 263 N.E.2d 81, 83.) Additionally, we do not fail to note that during trial, Wharton appeared on behalf of Phillips and extracted from the State a promise of immunity from the use of the testimony of Phillips at any future trial of Phillips. At the least, the dual representation of Phillips and defendant at trial evidenced the divided loyalty of the public defender in that he could not give full weight to the interests of both his clients at the same time. Since the record demonstrates the possibility that Hay was placed in an equivocal position of having to balance irreconcilable interests, which possibility was brought to the attention of the court prior to trial, we find that the lower court erred in denying the motion to grant Hay leave to withdraw and for the appointment of counsel other than the public defender.

Defendant next contends that the trial court erred in admitting in evidence the out-of-court statement by Phillips in lieu of direct examination of him.

It is a long-established general rule that a witness must deliver his testimony by uttering it orally. (3 Wigmore, Evidence §799 (Chadbourn rev. ed. 1970).) The testimony of the witness must correspond spontaneously to his actual recollection and, generally, it is prohibited to permit the witness to merely read a previously prepared statement in lieu of oral testimony. (3 Wigmore, Evidence §787 (Chadbourn rev. ed. 1970).) We need not consider the accepted exceptions to these rules since none are claimed and none would apply. It has been held fundamental that the defendant and the jury should be confronted by the witness under oath, and should have the benefit of his sworn testimony under direct examination and cross-examination. (*People v. Cox*, 87 Ill. App. 2d 243, 230 N.E.2d 900.) This manner of procedure best assures that: the witness, under oath, is fully impressed with the seriousness of his statements; the jury is given the fullest opportunity to observe the demeanor of the witness and assess his credibility; and the defendant is given the opportunity to cross-examine the witness at the time the statements are made.

■■ Nonetheless, the State urges that the statement herein was properly

admitted as substantive evidence since Phillips was expressly made available to defendant for cross-examination. (See *People v. Carpenter*, 28 Ill. 2d 116, 190 N.E.2d 738; McCormick, Evidence §251 (2d ed. (1972)).) However, this position was advanced and rejected by our supreme court in *People v. Collins*, 49 Ill. 2d 179, 274 N.E.2d 77, involving the use of a prior inconsistent statement of a witness containing direct assertions of the defendant's guilt. (See also *People v. Krug*, 38 Ill. App. 3d 383, 347 N.E.2d 807.) In *Collins* the court held the statement inadmissible as substantive evidence. Accordingly, we find that in the instant case the trial court erred in permitting Phillips to merely hand in a previously made statement in lieu of direct examination.

The foregoing errors warrant a reversal of judgment entered and a new trial. Since on retrial of the instant cause, the matter will likely arise again, we will next consider the admissibility of the tape recording of the criminal occurrence and the use of the transcript thereof.

■■■ Defendant contends that the tape recording was of such inferior quality as to render it inadmissible. A partially inaudible sound recording is inadmissible if the inaudible portions are so substantial as to render the recording, as a whole, untrustworthy. (29 Am. Jr. 2d *Evidence* §436 (1967); Annot., 57 A.L.R. 3d 746, 749 (1974).) This is a matter resting largely within the discretion of the trial court. Prior to trial, the lower court listened to the recording and found it admissible. We have also listened to the recording and find no basis to disturb the determination of the court below in this regard.

■■ Defendant further contends that the State failed to lay a proper foundation for the recording in that there was no evidence of the identity of the speakers. (See *United States v. McMillan* (8th Cir. 1974), 508 F.2d 101, *cert. denied*, 421 U.S. 916, 43 L. Ed. 2d 782, 95 S. Ct. 1577.) In Illinois, a sound recording which is otherwise competent, material and relevant is admissible if a proper foundation has been laid to assure the authenticity of the recording and its consequent reliability. (*Belfield v. Coop*, 8 Ill. 2d 293, 134 N.E.2d 249: *Roedl v. Lane*, 41 Ill. App. 3d 1062, 355 N.E.2d 354.) In the case at bar, the State produced evidence showing the nature and mechanics of the tape recording system that was installed at the Leading Food Store and that was operating on the day of the crime. Howard Owens identified the tape recording which was made and he stated that he had listened to the crime at the time it occurred, that he had thereafter listened to the tape, and that it was an accurate portrayal of the occurrence. Additionally a chain of custody over the tape was established. On this basis we find that the authenticity of the tape recording was properly established. That the identity of the speakers on the tape, particularly defendant, was not established, was of no import since, unlike the cases cited by defendant, the tape herein was not introduced

to connect defendant to the crime. Rather the State relied on a myriad of other evidence to prove that defendant was the perpetrator of the offenses. The tape was of independent relevance and was offered only to prove the events which had occurred; that is, that the offenses were committed. For this limited purpose, we find that the State laid a sufficient foundation for the admission of the tape.

Defendant further contends that it was error to have admitted the transcript of the tape. Although in his brief on appeal defendant insinuates that Vera Bolden was not qualified to transcribe the tape recording, defendant does not now dispute, nor did he in the lower court, the accuracy and reliability of the transcript. Instead, at issue is whether the jury attached independent weight to the transcript to the extent the recording itself was poor in quality.

■■ A transcript of a recording is admissible to assist a jury as it listens to the recording. (*United States v. McMillan*; 29 Am. Jur. 2d *Evidence* §436 (1967).) The transcript herein was admitted only for this limited purpose and as such it was properly admitted. The possibility that the jury may have attached independent weight to the transcript was substantially negated by the fact that the tape was played twice so that the jury could determine for itself the events presented on the tape. Moreover, after the jury listened to the tape, the transcript was collected from the jury, and it was not brought into the jury room. No doubt, a better practice would warrant that where, as here, a transcript is used only to assist a jury in listening to a tape, that the jury be admonished of the purpose of the transcript and instructed to determine for itself the events transpiring on the tape. We trust that, on retrial, such will be done.

In light of our holding we need not consider other issues raised by defendant. For the foregoing reasons, we reverse the judgment entered by the circuit court of Randolph County and we remand for a new trial at which counsel other than the public defender will be appointed to represent defendant.

Reversed and remanded with directions.

McCALLISTER, J., concurs.

Mr. JUSTICE KARNS, dissenting:

I have expressed my views on the subject of representation of multiple co-defendants by separate attorneys from a public defender's office and the so-called rule of *"per se"* conflict of interest in *People v. Meng*, 54 Ill. App. 3d 357, 369 N.E.2d 549 (5th Dist. 1977). I would like to amplify briefly my opposition to the blind, unthinking application of a *"per se"* rule.

In the first place, the expression *"per se"* conflict of interest is an unfortunate one; it is devoid of content and bars legal analysis of the actual problem before the court in these cases of representation of multiple co-defendants by a single lawyer, or two or more affiliated lawyers, that is, members of the same law firm or assistant public defenders in one public defender office; that is the problem of ineffective assistance of counsel. Note that in none of the cases cited as authority for this *"per se"* rule is there present any suggested or demonstrated ineffective representation by counsel, or any suggestion or demonstration that the guilty verdict or verdicts would have been otherwise had other counsel been provided.

The seminal case on conflict of interest, in reality ineffective assistance of counsel is *Glasser v. United States,* 315 U.S. 60, 86 L. Ed. 680, 62 S. Ct. 457 (1942). There the Supreme Court required a showing of actual ineffective representation or prejudice arising from the alleged conflict of interest. The court disavowed the *"per se"* rule. Nothing in the recent case of *Holloway v. Arkansas,* (1978), 435 U.S. 475, 55 L. Ed. 2d 426, 98 S. Ct. 1173, indicates a departure from the rule of *Glasser.* The dissent questions whether the court is adopting the *"per se"* rule, but it is clear to me that it did not as the facts fairly clearly demonstrate ineffective representation where one attorney was required to represent three co-defendants. As trial counsel stated, he was barred from furnishing effective representation to any of the defendants as he was precluded from cross-examination of any defendant for fear of developing evidence adverse to the remaining defendants. He stated to the court in advance of trial that he was possessed of certain confidential information that would restrict his ability to cross-examine certain of the defendants, but the trial court never made any inquiry into the nature of counsel's apprehension and summarily rejected his motion to withdraw.

The cases repeatedly cited as authority for the *"per se"* rule do not, in my opinion, stand as authority for the rule. Each involves a violation of the Code of Professional Conduct promulgated by the American Bar Association and the Illinois Code of Professional Responsibility adopted by the Illinois Bar Association or involves the appearance of impropriety on the part of counsel. Thus in *People v. Ware,* 39 Ill. 2d 66, 233 N.E.2d 421 (1968), and *People v. Johnson,* 46 Ill. 2d 266, 265 N.E.2d 869 (1970), the court was concerned with the appearance of ethical impropriety where a co-defendant, represented by a single, court-appointed attorney pleaded guilty, receiving favorable treatment, and then testified against a defendant who was represented by the same appointed attorney. Counsel was obviously placed in an ambivalent position with regard to attacking the truthfulness of his client, the co-defendant. While the court spoke of conflict of interest, none was articulated, nor did the court articulate any

rule as the basis for its decision which could be applied on a consistent basis in future cases. Both cases suggest the possibility of a violation of the attorney-client communication privilege; although, no violation was demonstrated.

In *People v. Stoval*, 40 Ill. 2d 109, 239 N.E.2d 441 (1968), appointed counsel was a member of a law firm that represented the victim of the crime charged against the defendant. The court condemned the dual representation by counsel. The same issue was present in *People v. Coslet*, 67 Ill. 2d 127, 364 N.E.2d 67 (1977), and *People v. Meyers*, 46 Ill. 2d 149, 263 N.E.2d 81 (1970). In *People v. Kester*, 66 Ill. 2d 162, 361 N.E.2d 569 (1977), defendant was represented by an assistant public defender who had appeared in opposition to his client as an assistant state's attorney. No actual conflict of interest was demonstrated, but the court reasoned that counsel might have been subliminally subject to subtle influences that might deprive his client of effective representation. The Canons of the Illinois Code of Professional Responsibility proscribe dual representation of conflicting interest and were cited with approval in *In Re Williams*, 57 Ill. 2d 63, 309 N.E.2d 579 (1974). I find none of the conduct of counsel condemned in these cases present here. As I noted in *Meng*, no Illinois Supreme Court case holds that assistant public defenders have no independent legal existence apart from the duly appointed public defender. The record belies the fiction that Spicer was in legal contemplation represented by the public defender, not assistant public defender Hay as it is apparent that Spicer received vigorous, independent representation from Hay. There is no suggestion or evidence that his judgment was affected by anything Wharton had done in his representation of Phillips.

While the manner of offering Phillips' testimony was unusual, I do not find it an error of such magnitude, if indeed it was error at all, to require reversal. I do not understand that the statement was taken to the jury room, only read to the jury.

Phillips adopted the statement as his testimony; it was not a "consistent" or "inconsistent" statement. He was subject to cross-examination and was under oath. Most writers condemn hearsay evidence because it is not subject to cross-examination. (5 Wigmore, Evidence §1361 *et seq.* (Chadbourn rev. ed. 1974).) Phillips was available for cross-examination. The Illinois Supreme Court has stated that the opportunity for cross-examination is the true test of hearsay. (*People v. Carpenter*, 28 Ill. 2d 116, 190 N.E.2d 738 (1963).) In any event, I would consider the error harmless considering the abundance of evidence of defendant's guilt.