THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* PAUL NICHOLS, Defendant-Appellant.

Fifth District    No. 77-388

Opinion filed April 2, 1979.—Rehearing denied May 11, 1979.

KARNS, J., concurring.
KUNCE, J., specially concurring.

Michael J. Rosborough and Rafael Schwimmer, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Clyde L. Kuehn, State's Attorney, of Belleville (Raymond F. Buckley, Jr., and Gillum Ferguson, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE JONES delivered the opinion of the court:

Defendant, Paul Nichols, and codefendant Kelly Williams, over objection, were jointly tried in the circuit court of St. Clair County for the

murder of Joseph Mosley. Following a jury trial, they were both found guilty and defendant Nichols was sentenced to a term of 14 to 20 years in the penitentiary. He appeals.

In this appeal defendant Nichols raises three issues: (1) whether he was denied the effective assisance of counsel because both he and Williams were represented by the public defender's office; (2) whether the court erred in refusing to provide funds for obtaining a psychiatric evaluation as to defendant's sanity at the time of the offense; and (3) whether defendant made a valid waiver of his rights against self-incrimination prior to confessing.

Defendant Nichols and codefendant Williams were charged in one indictment with murder, and at arraignment, the court appointed the office of the public defender to represent them both. Shortly thereafter motions were filed on behalf of each defendant to suppress confessions and to sever their causes for trial. Both were subsequently denied.

In part, the defendant's motion to sever asserted that severance of the two causes was necessary because Williams' defense would be in conflict with and antagonistic to defendant's defense.

When the severance motions were argued on March 21, 1977, the court was informed that the defendant intended to present an insanity defense while Williams would argue that he had not committed the offense and that the only persons involved were the defendant and Cordia Dunnigan, a potential witness for the State. This latter theory of the offense differed from that arising from the separate confessions of defendant and Williams which were in agreement that Williams, not defendant, had inflicted the injuries which resulted in the victim's death.

After hearing arguments the court denied the motions for severance and the cause proceeded to trial.

The defendant's first contention is that he was denied the effective assistance of counsel because both he and Williams were represented by the public defender's office.

It is fundamental that the sixth and fourteenth amendments to the United States Constitution guarantee the right to effective assistance of counsel (see *Powell v. Alabama* (1932), 287 U.S. 45, 71, 77 L. Ed. 158, 172, 53 S. Ct. 55, 65), and that this right requires that the person represented shall receive the undivided loyalty of counsel (*Glasser v. United States* (1942), 315 U.S. 60, 86 L. Ed. 680, 62 S. Ct. 457).

■■ Problems with respect to loyalty of counsel often arise in situations involving joint representation, that is, where one attorney represents several codefendants. We must note initially that this case involves joint representation even though Nichols and Williams were represented by separate attorneys from the public defender's office. This court has held that it must take the view that codefendants are represented by a single

attorney where the public defender's office was appointed to represent them. (*People v. Meng* (1977), 54 Ill. App. 3d 357, 369 N.E.2d 549; *People v. Spicer* (1978), 61 Ill. App. 3d 748, 378 N.E.2d 169, *appeal allowed*, 71 Ill. 2d 613.) Such was the case here.

██ Although joint representation of codefendants is not a *per se* violation of the right to effective assistance of counsel (*Holloway v. Arkansas* (1978), 435 U.S. 475, 55 L. Ed. 2d 426, 98 S. Ct. 1173) and a conflict of interests among codefendants is not inherent in joint representation situations merely by virtue of such representation (*People v. Vriner* (1978), 74 Ill. 2d 329, 385 N.E.2d 671; *People v. Berland* (1978), 74 Ill. 2d 286, 385 N.E.2d 649), our supreme court has recognized two distinct situations which entitle a defendant to prevail on a claim of ineffective assistance of counsel because of joint representation of codefendants. *People v. Vriner* (1978), 74 Ill. 2d 329, 337-42.

The first situation, represented by the case of *Holloway v. Arkansas*, exists when an attorney is required to represent codefendants whose interests are in conflict even though he adequately informed the court of the probable risk of conflict prior to trial. The second situation exists whenever a defendant can show an "actual conflict of interest manifested at trial." *People v. Berland* (1978), 74 Ill. 2d 286, 299-300; *People v. Vriner* (1978), 74 Ill. 2d 329, 339.

After examining the record, we find that the defendant must be held to have been denied effective assistance of counsel under the rule of *Holloway v. Arkansas.*

In *Holloway* the appointed attorney of codefendants whose cases were consolidated made pretrial motions for separate counsel and represented to the court that, as a result of confidential information received from the codefendants, he was confronted with the probable risk of a conflict of interests that would preclude him from providing effective assistance to each of the clients. The trial court denied the motions and defendants were convicted after trial. The Supreme Court reversed, holding that in face of the representations made by the attorney, the court should have either appointed separate counsel or taken adequate steps to determine whether the risk of conflict was too remote to warrant separate counsel. The court further held that the trial court's failure to do so deprived the defendants of the guarantee of effective assistance of counsel.

██ In this case, the defendants' appointed attorney made a pretrial motion for severance based on the antagonistic defenses of the codefendants. In addition, he specifically pointed out how their positions would conflict at trial. In essence, the public defender informed the court that in the interest of Williams he would present a defense which would accuse the defendant of being the murderer in order to prove Williams'

professed innocence. This was nothing less than an attempt to "sell off" one client, the defendant, in order to save Williams. It is our belief that this information was sufficient to bring home to the court the existence of a conflict of interests of such magnitude as to require appointment of separate counsel. Accordingly, we reverse defendant's conviction and remand this cause for a new trial.

We do not mean to suggest that the trial court failed to see an obvious problem with respect to representation. We may infer from the discussion which occurred at the motions hearing and the fact that the conflict information was presented in a motion for severance rather than a motion for separate counsel that neither defense counsel nor the court was aware that the defendants were being jointly represented. This is entirely understandable since the trial of this cause occurred prior to the time when this court recognized the rule that codefendants must be considered to be represented by a single attorney when they are represented by separate attorneys from the public defender's office.

We would also make the further comment that even if we were to disregard the pretrial proceedings and consider only what occurred at trial, we would find that an actual conflict of interest was manifested at trial, requiring a reversal for ineffective assistance of counsel under the rule of *Berland*.

In order to properly evaluate the defendant's second assertion of error we must set forth the following additional facts.

The defendant was arrested on March 4, 1976, and after being advised of his constitutional rights, he signed a waiver of rights form and made an oral confession which was transcribed by a police officer. Defendant's pretrial motion to suppress the confession was denied after a hearing, and the confession was admitted into evidence at trial. A similar confession of codefendant Williams was also admitted into evidence.

At the hearing on the motion to suppress the confession, the court on its own motion ordered that the defendant be examined to determine his competency to stand trial. This ruling was made over the objection of the defendant.

Dr. Clifford Gilpin was thereafter appointed to determine the defendant's competency. He examined the defendant on July 13, 1976, and in an evaluation dated August 18, 1976, diagnosed the defendant as suffering from chronic schizophrenia of a severe nature. The report further stated that it was Dr. Gilpin's opinion that the defendant was unfit for trial because of a mental disease.

On the basis of this evidence, the defendant was found unfit to stand trial at a hearing on October 29, 1976. The defendant was then admitted to the Chester Mental Health Center for examination and treatment. On February 18, 1977, another competency hearing was conducted at which

the only witness was Dr. John Goldsborough, a physician at the mental health center. Following this hearing, the court entered an order finding defendant fit for trial.

On March 17, 1977, the defendant filed an answer to the State's motion for discovery, indicating that he intended to present an insanity defense at trial. At a motions hearing on March 21, 1977, the assistant public defender representing defendant orally moved the court to order a new psychiatric examination be made in order to determine defendant's sanity at the time of the offense. Counsel informed the court that Dr. Gilpin had told him that he had formed no opinion with respect to this question as a result of his prior examination of defendant and that a new psychiatric evaluation would be necessary in order to form an opinion as to defendant's sanity at the time of the offense. The court denied the motion and the cause proceeded to trial.

Defendant asserts that the court's refusal to provide funds for obtaining a psychiatric evaluation of his sanity at the time of the offense deprived him of his constitutional right to compel the attendance of witnesses. We agree.

In *People v. Watson* (1966), 36 Ill. 2d 228, 221 N.E.2d 645, our supreme court held that in certain cases where an expert witness might be necessary to establish a defense, an indigent defendant is entitled to receive from the State a reasonable fee for the purposes of hiring an expert witness. The court recognized that although there is a distinction between the right to call witnesses and the right to have them paid for by the government, the lack of funds with which to pay for an expert witness will often preclude a defendant from calling one and sometimes prevent him from offering an adequate defense since the value of an expert witness' testimony lies in his preparation. His appearance is generally of no value unless he has been able to make findings upon which to base his testimony. *People v. Watson* (1966), 36 Ill. 2d 228, 233, 221 N.E.2d 645, 648.

The *Watson* rule has been clarified by later cases which indicate that a defendant is entitled to funds for expert testimony only if it is evident that the testimony is necessary to prove a crucial issue and that the defendant will be prejudiced if the testimony is not obtained. See *People v. Glover* (1971), 49 Ill. 2d 78, 273 N.E.2d 367; *People v. Vines* (1976), 43 Ill. App. 3d 986, 358 N.E.2d 72.

■ We hold that under the circumstances of this case it was error for the court to refuse funds to defendant for a new examination to determine his sanity at the time of the offense.

We note that the standards for competency to stand trial and sanity at the time of the offense are different and that a finding as to competency does not necessarily answer the question whether a defendant was sane at

an earlier time. See *People v. Seawright* (1966), 73 Ill. App. 2d 426, 220 N.E.2d 101.

Prior to trial no psychiatrist had ever conducted an examination with respect to defendant's sanity at the time of the offense. Dr. Gilpin was appointed solely for the purpose of determining defendant's present fitness to stand trial and his examination was limited to this question. Similarly, Dr. Goldsborough's examinations of defendant were for the purposes of determining whether he was in need of mental treatment and whether he was fit to stand trial. And although Dr. Goldsborough apparently formed an opinion during defendant's stay at the mental health center that defendant was sane at the time of the offense, this opinion was not the result of any examination conducted for this purpose but rather was dictated by the fact that he had found no evidence of psychosis on defendant's part between December 28, 1976, and February 8, 1977, when defendant left the center.

It is our belief that it was crucial to defendant's insanity defense to have an examination conducted with respect to his sanity at the time of the offense and that he was prejudiced because such an examination was refused.

The truth of the observation of the *Watson* court that an expert witness' appearance is of little value unless he has been able to make findings upon which to base his testimony was demonstrated in this case.

At trial, defendant offered the testimony of Dr. Gilpin in support of his insanity defense. When he was first asked to state an opinion as to the ultimate issue with respect to the insanity defense, he responded that he could not answer because he had not examined defendant with that question in mind. In short, he had no findings upon which to base his testimony. The defendant was therefore forced to attempt to get him to form an opinion while on the stand on the basis of hypothetical information. The results of this line of questioning were less than satisfactory since the doctor was understandably reluctant to express an opinion based on such assumptions rather than on the results of his own examination. A defendant should not be forced into presenting expert testimony on the insanity defense in such a manner since it affords him only the shadow of the right to call witnesses while depriving him of the substance.

The State argues that it was not necessary to have another psychiatric examination made since any testimony which would have been so developed would be merely cumulative to the testimony which was given at trial. We cannot agree. In our view, the information which a psychiatrist would possess after examining the defendant with respect to sanity at the time of the offense would be entirely different from

information offered at the trial and highly probative of the issue presented by the insanity defense. Insanity as a defense differs markedly from fitness to stand trial.

Inquiry into the question of the insanity of an accused as a defense to a crime differs markedly from the inquiry into the fitness of an accused to stand trial. The relevant times involved are but one of many variable factors that are brought to bear in the separate inquiries. Some factors important to insanity as a defense are irrelevant to fitness to stand trial, and vice versa. For this reason it is vitally important that the examining psychologist or psychiatrist know the purpose for which the examination and testing is being conducted.

Since, as discussed above, defendant was entitled to have a psychiatrist appointed to determine whether he was sane at the time of the offense, the circuit court should provide for such an appointment so that an examination and evaluation can be made prior to the new trial.

Defendant's final issue relates to the admissibility of his confession. He argues that the record does not support the trial court's finding that he made a valid waiver of his rights against self-incrimination prior to confessing.

It is well settled that the totality of the circumstances under which one's constitutional rights were waived or a confession made must be considered in order to determine whether a confession was voluntary. (*People v. Turner* (1973), 56 Ill. 2d 201, 205, 306 N.E.2d 27, 30; see also *People v. Simmons* (1975), 60 Ill. 2d 173, 326 N.E.2d 383; *People v. Hester* (1968), 39 Ill. 2d 489, 237 N.E.2d 466, *cert. dismissed* (1970), 397 U.S. 660, 25 L. Ed. 2d 642, 90 S. Ct. 1408.) After considering all of the circumstances presented below, we find that the trial court's initial ruling that the confession was admissible was not in error.

However, we recognize that the results of the new psychiatric examination may induce the court to inquire anew into the admissibility of the confession prior to a new trial; defendant's sanity at the time of the offense on March 3, 1976, could have some bearing on the totality of the circumstances under which he waived his constitutional rights before confessing on March 4, 1976. Suffice it to say, if the results of the new psychiatric examination indicate that defendant may have been insane, a new hearing on the admissibility of his confession may be required.

For the foregoing reasons, we reverse the judgment of the circuit court of St. Clair County and remand this cause with directions that defendant be afforded a psychiatric examination to determine his sanity at the time of the offense prior to the commencement of the new trial.

Reversed and remanded with directions.

Mr. JUSTICE KUNCE, specially concurring:

I concur with the majority opinion in all respects except the ruling on the admissibility of defendant's confession.

The evidence in the record touching on the defendant's mental capacity indicated that he was mentally retarded, a mental condition unlike mental illness that usually is neither curable nor effectively treated. Yet, on February 18, 1977, only 3½ months after confinement for "treatment" at the Chester Mental Health Center, the defendant's fitness was reviewed and he was found to have regained his fitness to stand trial. He had received a brain injury at the age of 5. In school he failed all his classes. At age 17 he possessed the intelligence of an 8-year-old child. His verbal skill was 63 and showed his mental and performance functions equal to a child of less than 6 with social judgment of a 9-year-old. It was the opinion of the school psychologist that had the defendant's current mental condition been similar to that with which he had functioned at the time he was tested in school, he would not have been able to read nor understand the constitutional rights read to him.

On arrest, he was advised of his *Miranda* rights. At the police station he signed a written *Miranda* waiver form. At the time, he informed the officer that he could neither read nor write but could print his name. The officer had him initial each of his rights and print his name beneath a declaration of his waiver of those rights. He misspelled his own name.

The officers gave no particular attention to defendant's mental handicap. There was no further evidence of questioning the defendant as to his age, education, social history or any other attempt to ascertain routinely the extent of his understanding or comprehension of his rights or other basic matters that might give some clue to the extent of his mental capacity by the officers or anyone else. There was no detailed or special formulation of defendant's rights or the warnings given that would further assist such a limited 17-year-old in understanding them. After printing his name, he was left alone seated in the foreboding police station for 3½ hours. This would have a coercive effect on the defendant. Then the interrogation by two police officers began. The interrogation lasted 1 hour 21 minutes and culminated in a four-page statement allegedly read to the defendant, given to him to read, and no further inquiry being made as to whether he could read or write.

Three months after his confession, the trial court found him mentally unfit to stand trial. This alone strongly buttresses defendant's contention that he did not knowingly and intelligently waive his rights. Although a defendant's subnormal intelligence alone does not prevent his understanding or waiving of his right to remain silent, his mental capabilities, or lack thereof, must be considered as one important factor along with his background, age, experience, conduct and characteristics.

All bear upon his ability to make knowledgeable and independent decisions. A statement elicited from a 17-year-old of subnormal intelligence is not necessarily inadmissible, but his youthful age as well as his mentality and familiarity with the English language must weigh upon the final determination. *People v. Stone* (5th Dist. 1978), 61 Ill. App. 3d 654, 378 N.E.2d 263; *People v. Turner* (1973), 56 Ill. 2d 201, 306 N.E.2d 27.

Under close scrutiny of all of these facts and the total circumstances surrounding the confession, considering the defendant's age, mental and emotional capacity, I am convinced that the defendant's confession was not voluntary and free of compulsion. Contrary to the majority, I would find that the trial court's initial ruling that the confession was admissible was error as against the manifest weight of the evidence.

Although the majority indicate that the new psychiatric examination may alert the trial court to hold a new suppression hearing, the opinion does not so mandate. I would require, in reversing the trial court, that a new suppression hearing on the admissibility of defendant's confession be held.

Mr. JUSTICE KARNS, concurring:

I concur in the decision reached that the failure of the court to appoint a psychiatrist to evaluate defendant's sanity at the time of the offense was error and requires reversal and remandment for a new trial.

I do not concur in that part of the opinion holding that defendant was denied the effective assistance of counsel when he and his co-defendant Williams were represented by different assistant public defenders. I do not agree that representation by separate attorneys from the office of a public defender is in legal effect representation by one attorney, presumably the appointed public defender. I have heretofore expressed my views on this subject in *People v. Meng*, 54 Ill. App. 3d 357, 369 N.E.2d 549 (5th Dist. 1977); *People v. Spicer*, 61 Ill. App. 3d 748, 378 N.E.2d 169 (5th Dist. 1978); and *People v. Ishman*, 61 Ill. App. 3d 517, 378 N.E.2d 179 (5th Dist. 1978). They need not be repeated here.

Furthermore, I do not find that the defenses of Williams and Nichols were antagonistic, simply different. Lastly, I believe this contention was waived under the rule of *People v. Precup*, 73 Ill. 2d 7, 382 N.E.2d 227 (1978), as the issue was not raised by defendant prior to or during the trial nor in his motion for a new trial.