(No. 50906.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant,
v. EDWARD SPICER, Appellee.

*Opinion filed October 19, 1979.*

174

CLARK, J., concurring.

William J. Scott, Attorney General, of Springfield, and Clyde L. Kuehn, State's Attorney, of Belleville (Donald B. Mackay and Melbourne A. Noel, Jr., Assistant Attorneys General, of Chicago, and Raymond F. Buckley, Jr., and Keith P. Vanden Dooren, of the State's Attorneys Appellate Service Commission, of Mt. Vernon), for the People.

John M. Reid and Rafael Schwimmer, of the Office of the State Appellate Defender, of Mt. Vernon, for appellee.

MR. JUSTICE WARD delivered the opinion of the court:

Early on the morning of November 15, 1975, Ben Seigel and Emmanuel Ukman were murdered in the course of a robbery at their grocery store in East St. Louis. Police Officer Bruce Moore, who had been summoned to the store, was shot and severely wounded by one of the robbers.

An indictment charging the commission of the crimes was returned by a grand jury in the circuit court of St. Clair County. Edward Spicer, the defendant here, was indicted jointly with James Phillips and Earl Good on two counts of murder, one count of attempted murder, and one count of armed robbery. Good pleaded guilty to the murder counts, and the remaining counts were dismissed on the prosecutor's motion. He received a sentence of 90 to 180 years. Phillips was found guilty on all counts after a jury trial and was sentenced to 20 to 60 years. The defendant's trial, on his motion, was moved to Randolph County and resulted, too, in a verdict of guilty on all counts of the indictment. He was sentenced to 200 to 400 years on each of the murder counts and 10 to 30 years on the other counts. The defendant, Phillips and Good were

individually represented by three assistant public defenders of St. Clair County. The appellate court reversed the defendant's conviction and remanded for a new trial on the grounds that he had been denied effective assistance of counsel by virtue of a conflict of interest because of the multiple representation by assistant public defenders of St. Clair County and that the trial court had improperly admitted an extrajudicial statement by Phillips, who already had been convicted and sentenced, as substantive evidence in the case in chief against the defendant. One justice dissented. (61 Ill. App. 3d 748.) We allowed the People's petition for leave to appeal. 65 Ill. 2d R. 315.

The circumstances of the crimes are set out at length in the appellate court's opinion (61 Ill. App. 3d 748). We will state only those relating to the questions before us. On the evening following the murders Phillips gave an unsworn, signed statement to the East St. Louis police. In it he stated that the three men had visited the store the day before the robbery and returned together again on the morning of November 15, 1975, in a station wagon which Phillips drove. He claimed that the defendant and Good had told him that, if he did not drive them to the store that morning, they "would kill my two babies." He said they repeated the threat when they took the keys from the station wagon and directed him to wait for them while they were in the store. Phillips waited about half an hour, and after he heard sounds of shooting, the defendant and Good, he said, rushed back to the car, threw him the keys and told him to drive. Phillips drove back to his house, after which the three went into the basement and divided the money taken in the robbery. Police arrived shortly thereafter, but before the officers came to the front porch, the defendant and Good, having seen them approaching, fled from the house.

The defendant was apprehended in Michigan and there he gave police a statement in which he admitted having gone to the store with Phillips and Good two days before the robbery. But in the statement he denied having

participated in the robbery, claiming that Phillips, Good and a "third party" were involved. He said he had remained at Phillips' house and denied he had shared in the money taken in the robbery.

The prosecution called Phillips to testify at the defendant's trial. He refused to be sworn until he had consulted with his attorney, and Assistant Public Defender Milton Wharton, who had represented Phillips at his trial, was called. At a hearing in the judge's chambers and in Phillips' presence, Wharton obtained from the prosecutor a promise of immunity for Phillips against the use of any testimony he might give should Phillips gain a retrial on his appeal, which was pending, and also immunity with respect to any "further prosecution of him." Phillips nevertheless continued to refuse to testify, expressing fears of gang retaliation while he was serving his term, although he conceded that the defendant had not personally threatened him. The trial judge found Phillips in contempt, but delayed imposition of punishment, telling Phillips he would withdraw the finding if he would change his mind during the course of the trial and testify. It appears that Phillips did change his mind; he later was sworn as a witness for the People.

Phillips stated his name and address, that he had been convicted and sentenced for the crimes charged in the indictment and that he had given a statement relating to them at the East St. Louis police station on the evening of November 15, 1975. Over the defendant's objections, he acknowledged that he had signed the statement shown him by the assistant State's Attorney, but also disclosed that he could not read. The statement was not read to him by the prosecutor. Phillips testified that he had told the truth in the statement concerning events as he recalled them, and it was then admitted into evidence. The defendant's attorney, Assistant Public Defender Rodger Hay, did not cross-examine Phillips and again made objection to the statement's admission. He also moved for a mistrial, which

was denied. The assistant State's Attorney then read Phillips' statement to the jury.

The People contend that the statement was properly admitted by the trial court as substantive evidence against the defendant because Phillips took the stand and was placed under oath, the jury was able to observe his demeanor, and the defendant was given an opportunity to cross-examine him regarding his statement had he chosen to do so. But we consider the question regarding Phillips is similar to the one arising upon a prosecutor's attempt to impeach a witness by a prior inconsistent statement. There, too, the situation involves a sworn witness, whose demeanor may be observed by the trier of fact and who is available to the defendant for cross-examination. This court, however, has rejected contentions that the impeaching material should be allowed to be considered as substantive evidence against an accused. See *People v. Bailey* (1975), 60 Ill. 2d 37, 43; *People v. Gant* (1974), 58 Ill. 2d 178, 183-85; *People v. Powell* (1973), 53 Ill. 2d 465, 472; *People v. Collins* (1971), 49 Ill. 2d 179, 194-98; *People v. Newman* (1964), 30 Ill. 2d 419, 423; *People v. Paradise* (1964), 30 Ill. 2d 381, 383-84 and cases cited therein.

Many of the reasons given for not permitting impeaching material to be considered as substantive evidence are applicable here: "Our present method of trial contemplates basically that in criminal cases *** all of the evidence is to be presented at a single time and place in a continuous proceeding. If all prior statements of witnesses are to be put before the jury or the judge as substantive evidence, the logistical problems of a trial—already serious —will be enhanced because it will be necessary to have present at the time and place of the trial not only those persons who witnessed the occurrence at firsthand, but also those persons to whom the firsthand witnesses have made statements about the occurrence, either orally or in writing." (*People v. Collins* (1971), 49 Ill. 2d 179, 198.)

"What the witness stated out of court and out of the presence of the defendant is pure hearsay and incompetent. Legally it is not evidence of defendant's guilt and cannot be received as proof of the fact at issue." (*People v. McKee* (1968), 39 Ill. 2d 265, 270.) "It must be recognized *** that in criminal cases these extrajudicial statements are often highly incriminating and are usually made outside the presence of the defendant. To give these statements substantive value would allow an accused to be convicted on extrajudicial statements of witnesses—a practice that runs counter to the notions of fairness on which our legal system is founded. (*Bridges v. Wixon,* 326 U.S. 135, 89 L. Ed. 2103, 65 S. Ct. 1443.) Therefore, prior self contradictions are not to be treated as having any substantive or independent testimonial value. *People v. Morgan* 28 Ill. 2d 55; *People v. Moses,* 11 Ill. 2d 84; see also 3 Wigmore on Evidence, 3rd ed. sec. 1018; McCormick on Evidence, sec. 39." *People v. Paradise* (1964), 30 Ill. 2d 381, 384.

*People v. Grigsby* (1934), 357 Ill. 141, involved a situation with resemblance to the case here. There a witness was called for the purpose of proving that the defendant had come to her house after a shooting and had told her that he "just shot a couple of guys." (357 Ill. 141, 144.) The witness' answers to the prosecutor's preliminary questions made it apparent that she would not give the testimony he anticipated. Upon the prosecutor's motion she was made a court's witness. The prosecutor proceeded to ask her a series of questions which embodied the substance of a prior written, unsigned statement she had given. The answers given to all but one of the questions were simply "Yes, sir." The court described this as an "indirect method of advance impeachment of a witness who had not testified to the contrary" (357 Ill. 141, 148) and noted:

"The issue is not whether the witness Lockard is honest or dishonest, reliable or unreliable, but

whether the defendant is guilty of the crime charged in the indictment. All of these matters sought to be introduced by the indirect method of advance impeachment of a witness who had not testified to the contrary are collateral to the main issue. Whether or not in a proper case they might be competent by way of impeachment, they were entirely incompetent and extremely prejudicial as here offered on the case in chief. To permit this method of attack would be dangerous in the extreme. It would make it possible for anyone, in effect, to confess for a defendant and to do this without any liability for perjury. Anyone might with perfect safety make a false statement out of court, and not under oath, to the effect that the defendant had told him that he killed someone. When in court and under oath upon a material point, and thus subject to penalties for perjury, it is to be presumed that he would refuse to so testify. If the State's attorney could be permitted, under these circumstances, to prove, by way of advance impeachment, that the witness said that the defendant had said certain things, it would present a situation of appalling seriousness." 357 Ill. 141, 148-49.

The case here, of course, does differ from *Grigsby.* Unlike the witness there, Phillips did testify under oath that he had told the truth in his statement. There are, however, other factors which do not support trustworthiness: his statement was not given under oath nor was it subject to contemporaneous cross-examination; the statement implicated the defendant and exculpated Phillips, who claimed to have acted under coercion; Phillips had been convicted of the crimes involved; he refused to testify directly even after having been found in contempt of court; he could not read; the statement was neither read to him prior to his adoption of it in court nor validated by

other witnesses (as was done in *Grigsby*); and there is the question whether, when he was granted immunity from any "further prosecution," he was immunized even from perjury in the testimony he was being urged to give. The People say he was not, citing the immunity statute which states that a witness will not be immunized from perjury in the solicited testimony. We consider that even if the People's position is correct, Phillips may have believed that his immunity was complete. As we have noted, the circumstances above fail to support the trustworthiness of Phillips' statement.

The cases which the People cite, in which evidence of transcripts from previous trials was admitted in lieu of the testimony of unavailable witnesses, are not in point in this unusual situation. The People cite, and we are not unmindful of, the Supreme Court's holding that the confrontation clause of the sixth amendment and the due process clause of the fourteenth amendment are satisfied if there is an opportunity at trial for full and effective cross-examination of a witness on prior inconsistent statements. (*California v. Green* (1970), 399 U.S. 149, 26 L. Ed. 2d 489, 90 S. Ct. 1930.) *Green,* however, does not govern here. As we explained earlier in this opinion, this court denies on an evidentiary—not a constitutional—basis the substantive use of prior inconsistent statements of a witness. Even apart from that, it is questionable whether Phillips, though present in court, would have been really available for full and effective cross-examination. He refused to give direct testimony, and he might have testified on cross-examination, if at all, with the belief that the broad grant of immunity against the use of his testimony in any new trial or in any "further prosecution of him," might protect him against a prosecution for perjury while testifying under that cross-examination.

A remaining question is whether the error of admitting Phillips' statement requires reversal of the defendant's conviction. We consider it does not. The other evidence of

the defendant's guilt was sufficient to show his guilt beyond a reasonable doubt. (*People v. Pittman* (1973), 55 Ill. 2d 39, 59; *People v. Wilson* (1972), 51 Ill. 2d 302, 308.) Even were the error to be considered constitutional in character we judge it was harmless. "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (*Chapman v. California* (1967), 386 U.S. 18, 24, 17 L. Ed. 2d 705, 711, 87 S. Ct. 824, 828.) Our decision in this "must be based on our own reading of the record and on what seems to us to have been the probable impact" of Phillips' statement "on the minds of the average jury." *Harrington v. California* (1969), 395 U.S. 250, 254, 23 L. Ed. 2d 284, 288, 89 S. Ct. 1726, 1728.

Independent of Phillips' statement, there was completely convincing evidence of the defendant's guilt. Contradicting the statement of the defendant (that is, the written statement given to police in Michigan; the defendant did not take the stand), which was admitted into evidence, witnesses who were in Phillips' house at the time testified that the defendant, Phillips and Good left the house together on the morning of the crimes. There was no other person with them. (The defendant said Phillips, Good and a "third party from St. Louis" left together, committed the crimes and returned together.)

Police Officer Bruce Moore positively identified the defendant as being the robber who shot him in the neck from a distance of approximately 10 feet. The officer said he had a "good look" at the defendant. "I looked directly at the subject and he fired a shot ***." "I was looking at, it seems as though I was looking directly down the barrel. It was that close."

Witnesses who were at Phillips' house also testified that the defendant, Phillips and Good returned to Phillips' house after the robbery. There was no "third party."

In his own statement, the defendant implicates him-

self in discussing the proposed robbery, concedes that he "cased" the store along with Phillips and Good but thought the robbery would be risky because of the location of a mirror and the possibility of a burglar alarm, that he was in Phillips' house immediately before and after the robbery and observed Phillips, Good and the "third party" divide money from the robbery, and that he and Good fled together when they saw police officers coming to Phillips' house. In his statement the defendant said they left by the back door, went down the alley to a filling station and paid a cab driver $50 to take them to St. Louis. They bought two bus tickets to Chicago but took a plane to Chicago because the defendant thought the bus would be stopped by the police when it passed through East St. Louis. Both the defendant and Good bought plane tickets under aliases, the defendant said in his statement. (Some of this evidence of flight, it should be mentioned, may not be totally without an ambiguous aspect. It appears from the record that the defendant and Good had been charged with murders in Chicago and the defendant simply may not have wanted to undergo questioning by East St. Louis police.) Except for Phillips' claim that he was coerced, the content of Phillips' statement was practically the same as other evidence properly before the jury. Phillips' statement was not referred to in closing argument to the jury, and a cautionary instruction was given regarding the weight to be accorded the testimony of an accomplice witness. On this record we conclude that the error as to Phillips' statement, even measured by the standard for constitutional error, was harmless beyond a reasonable doubt. See *Brown v. United States* (1973), 411 U.S. 223, 36 L. Ed. 2d 208, 93 S. Ct. 1565; *Schneble v. Florida* (1972), 405 U.S. 427, 31 L. Ed. 2d 340, 92 S. Ct. 1056; *Harrington v. California* (1969), 395 U.S. 250, 23 L. Ed. 2d 284, 89 S. Ct. 1726; *People v. Gant* (1974), 58 Ill. 2d 178; *People v. Gill* (1973), 54 Ill. 2d 357.

Next we consider whether the defendant's attorney

served under a conflict of interest at his trial. The defendant contends there was a conflict of interest because he and Phillips were each represented by assistant public defenders, each of whom was serving in the office of the public defender of St. Clair County.

About a week before the defendant's trial his attorney, Assistant Public Defender Hay, learned that the State might call Phillips as a witness. On the day of trial, but before it began, Hay moved for leave to withdraw as the defendant's attorney on the ground that another assistant public defender had represented Phillips, who had just been subpoenaed and was expected to be called as a prosecution witness. The trial court denied the motion.

Accepting, *arguendo,* the defendant's thesis that the representation of the defendant and Phillips was tantamount to joint representation, our discussion should begin with the observation that it has been recognized that requiring or permitting one attorney to represent multiple defendants is not a *per se* violation of the right to effective assistance of counsel. *Holloway v. Arkansas* (1978), 435 U.S. 475, 55 L. Ed. 2d 426, 98 S. Ct. 1173; *Glasser v. United States* (1942), 315 U.S. 60, 86 L. Ed. 680, 62 S. Ct. 457; *People v. Vriner* (1978), 74 Ill. 2d 329, 337; *People v. Precup* (1978), 73 Ill. 2d 7, 10; *People v. Berland* (1978), 74 Ill. 2d 286, 300; *People v. Durley* (1972), 53 Ill. 2d 156, 160.) The Supreme Court in *Holloway v. Arkansas* (1978), 435 U.S. 475, 482, 55 L. Ed. 2d 426, 433, 98 S. Ct. 1173, 1178, stated:

> "One principle applicable here emerges from *Glasser* without ambiguity. Requiring or permitting a single attorney to represent codefendants, often referred to as joint representation, is not *per se* violative of constitutional guarantees of effective assistance of counsel. This principle recognizes that in some cases multiple defendants can appropriately be represented by one attorney \*\*\*."

Thus, codefendants tried separately, as here, may be represented by a single attorney or, by extension, by individual assistant public defenders, in the absence of circumstances which would require different counsel. The defendant was represented by an assistant public defender who had not represented Phillips or Good, and was given a separate trial. The record shows that his defense was conducted vigorously and ably.

The defendant's contention here that his right to cross-examine Phillips was in some way restricted because of Phillips' representation by the public defender's office appears to have been first articulated on his appeal. No complaint of any impairment of the right to cross-examine was made at trial or on the defendant's motion for a new trial. That there was no impairment of cross-examination, however, is evidenced by the fact that the defendant's attorney waived cross-examination of Phillips. The waiver was not because the attorney claimed any handicap in cross-examining Phillips due to his representation by the public defender's office; he did not exercise his right to cross-examine because he didn't "feel that there was anything to cross-examine him on." This was said by the defendant's attorney after the trial court had at least twice told him he could cross-examine Phillips. The attorney's objections at the time were directed against receiving Phillips' statement. The record indicates that he acknowledged his right to cross-examine and that he simply did not want to question Phillips concerning his statement. Factors sometimes found in cases of conflicts of interest involving cross-examination were absent here. There was no claim that there was any ethical or professional inhibition against the defendant's attorney bringing out or requiring Phillips to divulge any confidential information on cross-examination. There was no statement by the defendant's attorney that he had any confidential information because of Phillips having been represented by another assistant public defender. The defendant's attorney did not show or claim a feeling of any conflicting duty to Phillips. He

presented testimony from three witnesses that was in contradiction to Phillips' statement. The trial court did not err in denying what was, on this record, simply a formal motion to withdraw as counsel. The sixth amendment would, of course, interdict representation by an attorney who was representing conflicting interests. That was not the case here. There were no divided loyalties to cause the defendant's attorney to sacrifice his client's interest in any way.

For the reasons given, the judgment of the appellate court, reversing the judgment of the circuit court of Randolph County and remanding the cause, is reversed, and the judgment of the circuit court is affirmed.

*Appellate court reversed;*
*circuit court affirmed.*

MR. JUSTICE CLARK, concurring:

I concur in the decision and judgment of the court, but I am concerned that the majority's assumption, *arguendo,* that joint representation exists may lead to confusion and may be seen as inconsistent with our recent decision in *People v. Robinson* (1979), 79 Ill. 2d 147. We held there that a public defender's office is not an entity sufficiently similar to a law firm to invoke a *per se* conflict of interest rule whenever two or more assistant public defenders separately represent alleged coperpetrators of an offense. Therefore, by assuming, even for the sake of argument, that joint representation exists, the majority herein accepts a thesis which has been rejected by this court. I think the preferable approach would be to decide that there was no joint representation in this case. Since the defendant hinges the presence of a conflict of interest, and consequently ineffective assistance of counsel, upon the establishment of joint representation, it would seem that once no joint representation was found, the remainder of defendant's contentions must fail.