THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CHARLES E. DAY *et al.*, Defendants-Appellants.

First District (5th Division)   No . 78-571

Opinion filed September 21, 1979.

James R. Kavanaugh, of Chicago, for appellant Ivory Davis.

Susan Solovy, of State Appellate Defender's Office, of Chicago, for appellant Charles E. Day.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr and James S. Veldman, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Defendants were charged by information with attempt armed robbery (Ill. Rev. Stat. 1973, ch. 38, pars. 8—4 and 18—2) and murder (Ill. Rev. Stat. 1973, ch. 38, par. 9—1). Following a jury trial, they were found guilty of both offenses but judgment was entered on the murder charge only. Day was sentenced to a term of 40 to 65 years, and Davis received a term of 50 to 75 years.

Each defendant has filed a separate brief on appeal. Both defendants contend that they were denied effective assistance of counsel. In addition, Day contends: (1) he was denied his statutory right to a speedy trial; and (2) evidence of the circumstances of his arrest was improperly admitted. Davis contends: (1) he was not proved guilty beyond a reasonable doubt; (2) an alleged statement by defendant Day was improperly admitted; and (3) his sentence is excessive. We affirm. The pertinent facts follow.

Defendants were arrested on March 2, 1976, for the murder of

Solomon Marcus. The public defender was appointed to represent both defendants. Prior to trial Davis made a motion for severance based on the belief that Day's defense would be conflicting with his own. After a hearing, the motion was denied.

Day made a pretrial motion for his discharge because of an alleged violation of his statutory right to a speedy trial. (Ill. Rev. Stat. 1975, ch. 38, par. 103—5(e).) This motion was also denied after a hearing. Day also sought to exclude testimony regarding the circumstances of his arrest on an unrelated charge. The trial court reserved ruling on this point, but at trial the testimony was admitted.

The following pertinent evidence was adduced at trial.

*For the State*

Chicago police officer John Hennis testified. On February 7, 1976, he went to 4000 West Fifth Avenue to investigate a shooting in a grocery store. He saw the victim, Solomon Marcus, lying face down on the floor, apparently dead. He removed a .357 magnum pistol from the victim's waistband and removed three expended and three live cartridges. He received a description of the assailants and broadcast it over his police radio.

Minnie Lee Jackson, also known as Minnie Lee Green, testified. On February 7, 1976, she was shopping in the grocery store with her grandson. Two young men entered the store before her. One went to the rear of the store and the other remained near the front door. She didn't pay attention to these men and went to a counter which Solomon Marcus was behind. A small child was also standing at the counter. She asked Marcus for several items and she walked towards the rear of the store. One of the men walked up to the counter and stood next to her. He pulled out a gun, pointed it at Marcus, and said "Stick 'em up." He then started shooting at Marcus, who staggered and fell. The man ran out the door. The second man pushed her against a counter, fired a shot, and ran out the door. She could not identify the two except to say they were young black men. She looked at Marcus and then left the store. On the way out she met Jacob Williams who agreed to stay with the victim until she could get help. She went home and called the police.

Jacob Williams testified. He arrived at Fifth Avenue and Keeler by bus and intended to go to the grocery store. He heard someone shout that "Lee" had been shot and saw two men run to a 1968 or 1969 Cadillac, blue with a black top, which was facing north on Keeler. The men were tall and of medium build. After the car pulled away, he went to the store, where he saw Minnie Jackson, who asked him to stay with Marcus. Jackson noticed that the victim had a gun in his waistband.

On cross-examination Jackson said the car was parked northbound

on Keeler but admitted he told police that it was westbound on Fifth Avenue. He said that the car left at a high rate of speed.

James Boyd testified. He was driving a bus past Fifth and Keeler at the time of the shooting. He heard a shot and saw two men running from a grocery store to a 1967 or 1968 Cadillac. After they got in the car, it went north on Keeler. The men were black, but he did not see their faces.

Richard Thompson, a Chicago police officer, testified. He conducted a physical examination of the crime scene and recovered a bullet fragment. It was stipulated that fragment was part of a .38-caliber bullet and that it could have been fired from a .357 magnum revolver.

Investigator Michael O'Connor of the Chicago Police Department testified. On March 1, 1976, a man named William Tensley came to him and spoke to him concerning the shooting. O'Connor was not familiar with the case but, after checking police file , learned that a homicide was involved. He then turned the matter over to homicide investigators. Tensley led the police to Charles Day's residence where Day was arrested. The police also arrested Ivory Davis at his home.

William Tensley testified. Ivory Davis is his first cousin and he had known Charles Day for about three years. On February 7, 1976, Ivory Davis asked him to repair a car which allegedly belonged to Day. The car was a 1968 Cadillac four door, blue with a black vinyl top. He identified a photograph as being the car except for some body damage to the car. He checked the car and was returning it to Davis' house, when Davis told him to drive the car. He drove to Fifth and Keeler and parked on the corner. Davis said he was getting something to eat and Tensley requested some pop. Day and Davis went into the store. Tensley remained in the car with the motor running. He noticed a lady and a child enter the store after Day and Davis. He also noticed a bus on the corner. He heard some shots and looked in the direction of the store. He saw Day "ducking" inside the store, and then the two came out of the store "walking fast" and got into the back of the car. Tensley saw that Davis had a .32 short barrel pistol and that they both had money. He heard Day tell Davis, "I sure liked the way you popped that dude. I thought he had me for a minute but you came right up on time." Tensley drove to about 15th and Troop, got out and gave them the keys. He recalled seeing a "title paper" in the car in the name of Larry Lewis of Chicago Heights.

On March 1, 1976, he voluntarily went to a police station and spoke with Officer O'Connor. He directed the police to the homes of Davis and Day. Later, he was handcuffed at the police station but was able to pick the lock and escape. He returned later and spoke with Officer O'Connor. He denied knowing a woman named Joann Marshall, or having any problems or fights with either Davis or Day.

On cross-examination Tensley admitted that at the station he felt that

he was under arrest and a suspect in the case. He said that he had driven the car several times prior to February 7, 1976, and continued to drive it for two weeks after the incident. He also stated that he did not have any idea of what was going on at the time of the incident and that he drove away from the scene at a normal rate of speed.

Dr. Eupis Choi, a pathologist, testified. He performed an autopsy on the body of Solomon Marcus. In his opinion Marcus died from a bullet wound in the chest, which penetrated the heart. He recovered a bullet from the body and both sides stipulated that it was a .32-caliber bullet.

Terrence Gall, an Oak Park police officer, testified. On February 18, 1976, at about 2 a.m. he and his partner stopped a greenish-blue Cadillac for failure to display State license plates. In response to his request for a driver's license, Charles Day identified himself as Charles Davis and gave him an illegible traffic ticket. He asked for further identification and the car's registration, but Day did not produce any. He then asked Day to follow him to the police station. Day followed for several blocks but then turned at a corner and proceeded at a high speed. The officers chased the Cadillac at speeds up to 60 or 70 miles per hour. After the chase continued for some distance, the car crashed into an elevated train structure. Day was arrested. A check of the vehicle identification number revealed that the car had been reported stolen. A defense motion for mistrial based upon this evidence of other crimes was denied.

Investigator Robert Padgorny testified. On March 1, 1976, he spoke to William Tensley and then went to Day's house. He was admitted by Mrs. Day and permitted to look upstairs for Charles. In a bedroom on the second floor which Mrs. Day indicated was Charles' he saw a leather shoulder holster and 1975 Illinois license plates, number YN 6763. He identified these items at trial. He also saw a handgun. He heard voices downstairs and saw that Charles Day had been arrested. He then went to the Davis residence and placed Ivory under arrest.

On cross-examination Padgorny stated that prior to talking to Tensley there was no indication of defendant's involvement in the case. He did not ascertain who owned the items found in the bedroom. He knew that the pistol he saw was a .22-caliber gun.

Investigator Fred Stone of the Chicago Police Department testified. He was with Officer Padgorny when Day was arrested. Mrs. Day had directed them to the bedroom which she indicated was Charles'. He recovered a pistol from the room and identified it at trial as a .22-caliber revolver. He also saw the holster and license plates which Padgorny had taken. He went downstairs and saw Day in custody. Later, he saw Davis placed under arrest.

On cross-examination he admitted that he did not know who owned the holster, gun, or license plates that had been recovered.

*For the Defense*

Mrs. Josie Day, Charles' mother, testified. At about 2 a.m. on March 2, 1976, police knocked on the door of her home. She ran upstairs to get a housecoat and then opened the door. A policeman asked if Charles was home and she said she did not know. She did not direct them to any room on the second floor, since his room is on the first floor. She did not see the police take anything from her home.

Geraldine Day, defendant's sister, testified. She knew William Tensley by his nickname, "Will Kill." On February 29, 1976, he came to the Day home looking for Charles and "Joann" who were not home. He gave her a brown bag containing license plates to give to Charles. She identified the plates recovered by the police as the same ones. She put them in her bedroom which is on the second floor in the rear of the house. Charles' room was on the first floor. At about 2 a.m. on March 2, she was staying in her bedroom when she heard a lot of noise. The police were searching the house and went into her room. They removed a gun and holster which belonged to her boyfriend.

Joann Marshall testified. She met William Tensley at Ivory Davis' house in 1974 and dated him for about 1½ years. She also knew him as "Will Kill." In December 1975, she met Charles Day at Ivory Davis' house and began dating him. She and Tensley quarreled about her seeing Day. After this she did not date Tensley. About a month before trial, Tensley called her and said that if she came back to him he would not testify against Day. She also testified that Day purchased a green Cadillac Coupe de Ville.

Ronny Taylor testified. He was present when William Tensley had an argument with Ivory Davis in January 1976 about Davis introducing Day to Joann Marshall, Tensley's girlfriend. Tensley told Davis that he and Day would "pay for it."

*State's Rebuttal*

Investigator Donald Senase of the Chicago Police Department testified. He was one of the policemen who went to the Day residence to arrest Charles. When Mrs. Day was asked about Charles, she responded by saying "Charles' room is up there" and pointed up the stairs. In the room he saw only men's clothing. He stated that he had known William Tensley before the instant case and had received information from him in the past.

It was stipulated that if called, the court reporter from the preliminary hearing would testify that nowhere in the transcript of Tensley's testimony did he say that he saw money in Day's or Davis' hands and that the question was not asked.

The jury found both defendants guilty of murder and attempt armed

robbery. Judgment was entered on the murder verdicts only. It is from these judgments that defendants appeal.

OPINION

I.

Defendants contend that they were denied effective assistance of counsel since each was represented by an assistant public defender and a conflict existed between their interests. They assert that since the two assistant public defenders must be considered as one attorney (*People v. Spicer* (1978), 61 Ill. App. 3d 748, 378 N.E.2d 169; *People v. Meng* (1977), 54 Ill. App. 3d 357, 369 N.E.2d 549) and their defenses were conflicting, one attorney could not adequately or loyally defend either defendant. They suggest that because of this, the *per se* rule of reversal (*People v. Meng*; *People v. Ishman* (1978), 61 Ill. App. 3d 517, 378 N.E.2d 179) must be invoked to grant them a new trial.

■■ ■ The sixth and fourteenth amendments to the United States Constitution guarantee the right to effective assistance of counsel (*People v. Vriner* (1978), 74 Ill. 2d 329, 385 N.E.2d 671) and implicitly guarantee a defendant's right to the undivided loyalty of his counsel. (*Glasser v. United States* (1942), 315 U.S. 60, 86 L. Ed. 680, 62 S. Ct. 457; *People v. Williams* (1978), 68 Ill. App. 3d 1, 385 N.E.2d 776.) Although joint representation of co-defendants is not a *per se* violation of this guarantee, to require an attorney to represent two co-defendants whose interests are in conflict denies one of them the right to effective assistance of counsel. *Holloway v. Arkansas* (1978), 435 U.S. 475, 55 L. Ed. 2d 426, 98 S. Ct. 1173.

■■ However, in order to prevail in a constitutional claim of ineffective assistance of counsel due to joint representation of co-defendants by a single attorney, a defendant must show an actual conflict of interest manifested at trial. (*People v. Berland* (1978), 74 Ill. 2d 286, 385 N.E.2d 649; *People v. Vriner*.) A conflict of interest is not inherent in cases of joint representation merely by virtue of such representation. (*People v. Berland*.) Before reversing a conviction without requiring a showing of prejudice to a defendant, a positive basis must be found for concluding that an actual conflict of interest existed. *People v. Good* (1979), 68 Ill. App. 3d 333, 385 N.E.2d 911.

■■ The pretrial motion for a severance was based on anticipated problems with Day's statement to Davis that "I sure liked the way you popped that dude." Counsel argued that this showed a conflict since it names Davis as the shooter and would not be admissible against him if he were tried separately. As discussed later, the statement would be

admissible against Davis at a separate trial, and no conflict was manifested at trial because of this.

Defendants point to several factors which they contend demonstrate that an actual conflict existed at trial. Day argues that the statement during flight and the gun, holster and license plates seized from his home show a conflict. As already stated, the statement does not involve any conflict. Concerning the physical evidence, it is argued that Davis would try to emphasize its connections with Day, while since the gun recovered could not be the murder weapon based on its caliber, Day could only harm Davis with this evidence. This again does not show any conflict. It was established that the victim died of a wound from a .32-caliber bullet, and that the gun recovered was a .22-caliber pistol. Clearly this was not the murder weapon, as the jury was aware. There was no proof as to the existence of the .32 pistol or which defendant had it. The license plate served to link Day to the car. However, none of the physical evidence would exonerate one defendant at the expense of the other or demonstrate a conflict of interest.

Davis points out that the evidence of Day's use of the Cadillac, his arrest after the high-speed chase, and the recovery of the license plates and gun from his house prejudiced him at trial. Any evidence connecting a co-defendant with the crime would be prejudicial; however, it does not establish any conflict between their interests at trial. Their defenses were similar, an attack on Tensley's credibility based on his bias and motive to fabricate testimony. This case is unlike *People v. Baxtrom* (1978), 61 Ill. App. 3d 546, 378 N.E.2d 182, where each defendant tried to place the guilt on the other. Here neither defendant testified to accuse the other but relied on the evidence of Tensley's bias to discredit his testimony. It would be fruitless for defendants to accuse each other since each would be accountable for the other's acts. Ill. Rev. Stat. 1977, ch. 38, pars. 5—1 and 5—2.

Day contends that the conduct of the trial demonstrates the defense attorneys' recognition of the conflict. He emphasizes that each attorney presented a distinct defense, made separate opening and closing statements, conducted separate examinations of witnesses, and delivered separate arguments in mitigation before sentencing. Contrary to Day's contentions, we view this as a diligent and competent effort on the part of each assistant public defender to represent his client. Since this case involves appointed rather than retained counsel, closer scrutiny for conflicting interests is required. (*People v. Berland.*) However, we find that defendants have not shown any actual conflict of interest manifested at trial nor does a close scrutiny of the record reveal any. Defendants attempt to establish a conflict where none existed, and this court will not

disturb their judgments on the basis of hypothetical conflicts. (*People v. Berland.*) We therefore conclude that defendants were not denied their right to effective assistance of counsel.

## II.

Ivory Davis contends that his guilt was not proved beyond a reasonable doubt. He asserts that the only evidence of his involvement in the crime is the testimony of William Tensley, since none of the other occurrence witnesses could identify the people who killed the victim. He points to several alleged inconsistencies in the testimony of Tensley and the other witnesses and concludes that they show that Tensley's testimony is incredible and a fabrication. In addition, Davis suggests that Tensley was actually an accomplice in the crime and that his testimony is to be discredited. Contrary to this position, the State contends that Tensley's testimony was corroborated by the other witnesses and believed by the jury.

The following are the inconsistencies which Davis contends demonstrate the unreliability of Tensley's testimony: (1) Williams testified that the two men ran from the store to the car, while Tensley said they were "walking fast"; (2) Williams said the car left at a "high rate of speed," and Tensley said he drove away at a normal rate; (3) Williams did not say there was someone in the car or that the two assailants entered the back seat of the car, suggesting there was no get-away driver; (4) Tensley said he saw a gun in Davis' hand as he approached the car and the other witnesses did not mention a gun: and (5) at the preliminary hearing Tensley did not state who carried a gun or its caliber but was able to do both at trial. These inconsistencies cited are very trivial and do not impeach or discredit Tensley's testimony. The other witnesses' failure to testify about a gun, which doors the men used to enter the car, or the existence of a driver, does not prove that Tensley fabricated these facts but merely that the others did not observe them from their vantage.

■■ ■ The defense offered at trial was that Tensley had a motive for framing defendants and that he may have been accountable for the murder also. An instruction on accomplice testimony was given at trial. The possibility that Tensley was an accomplice was before the jury. Whether accomplice testimony, corroborated or uncorroborated, is a satisfactory basis for conviction goes to the weight of the evidence and is, therefore, in the province of the jury. (*People v. Wilson* (1977), 66 Ill. 2d 346, 362 N.E.2d 291.) Even if Tensley is viewed as an accomplice, his testimony was sufficiently corroborated to carry an absolute conviction of truth. (*People v. Hermens* (1955), 5 Ill. 2d 277, 125 N.E.2d 500; *People v. Wilson.*) A reviewing court may not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence

credibility of the witnesses, and will not reverse a criminal conviction unless the evidence is so improbable as to raise a reasonable doubt of guilt. (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513.) The evidence in the instant case is not so improbable as to create a reasonable doubt of Davis' guilt. *People v. Yarbrough* (1977), 67 Ill. 2d 222, 367 N.E.2d 666.

### III.

Davis next contends that the admission of Day's statement "I sure liked the way you popped that dude. I thought he had me for a minute but you came right up on time" was improper since it was inadmissible hearsay and violated his confrontation rights under the fourteenth amendment. (U. S. Const., amend. XIV.) The State argues that the statement was properly admitted under the exception to the hearsay rule which, when a conspiracy is established, permits the declarations of each member of the conspiracy in furtherance of the common design to be admitted against all. *People v. Niemoth* (1951), 409 Ill. 111, 98 N.E.2d 733, *cert. denied* (1952), 344 U.S. 858, 97 L. Ed. 666, 73 S. Ct. 97; *People v. Morrow* (1976), 40 Ill. App. 3d 1020, 353 N.E.2d 354.

■■ Although it is not necessary that a conspiracy be charged to invoke the exception (*People v. Niemoth; People v. Morrow*), it is necessary to show at least a *prima facie* case that two or more persons were engaged in a common plan to accomplish a criminal goal. (*People v. Simpson* (1976), 39 Ill. App. 3d 318, 349 N.E.2d 441.) Defendant relies on *Simpson* where the court found that since no evidence of a conspiracy had been presented at trial, the statement had not satisfied the requirements of the exception. Unlike *Simpson,* we feel that there was sufficient independent proof of the conspiracy.

■■ Ms. Jackson's testimony clearly showed a conspiracy to rob the store. The two men entered together. After one announced the robbery and shot Marcus, the other covered his retreat by firing a shot at the children in the rear of the store. The fact that both men were armed would show a predesigned plan to commit the crime. The evidence taken as a whole shows an agreement to rob the store, and we find that the conspiracy was adequately presented. The statement made during the escape was properly admitted as a conspirator's declaration. *People v. Daniels* (1968), 92 Ill. App. 2d 207, 235 N.E.2d 305; *People v. Meagher* (1979), 70 Ill. App. 3d 597, 388 N.E.2d 801.

■■ The fact that Day did not testify at trial did not violate Davis' right to confrontation. As the Supreme Court determined in *Dutton v. Evans* (1970), 400 U.S. 74, 27 L. Ed. 2d 213, 91 S. Ct. 210, the hearsay rule and the

confrontation clause, although similar, are not to be equated. As was stated in that opinion, "From the viewpoint of the Confrontation Clause, a witness under oath, subject to cross-examination, and whose demeanor can be observed by the trier of fact, is a reliable informant not only as to what he has seen but also as to what he has heard." (400 U.S. 74, 88, 27 L. Ed. 2d 213, 226, 91 S. Ct. 210, 219.) After reviewing the indicia of reliability of the out-of-court statements of the declarant, and deciding that the witness relating the declaration had been adequately cross-examined, the Supreme Court concluded that cross-examination of the declarant could not discredit the statement by the witness, and defendant was not denied his right to confrontation.

Likewise in the instant case, the statement of Day was admitted as a hearsay declaration. Since it is very unlikely that cross-examination of Day would have shown that the statement, though made, was unreliable, and Tensley was cross-examined at trial, Davis was not denied his right to confrontation.

### IV.

■■ Finally, Davis contends that his sentence of 50 to 75 years was inappropriate in light of the fact that he was 18 at the time of sentencing and this was his first conviction. The record reveals that the trial court considered the nature of the crime, the age of the defendant, and his chances for rehabilitation in determining the sentence. The judge admitted that the sentence was lengthy but felt that it was "reasonable." He was in the best position to assess and weigh all the factors relevant to the sentence, and as it does not appear that he abused his discretion, the sentence will not be disturbed. *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.

### V.

Day contends that he was denied his statutory right to a speedy trial (Ill. Rev. Stat. 1975, ch. 38, par. 103—5(e)) because his trial on the instant charges did not commence within the statutory period. That subsection of the statute deals with persons in custody with more than one charge pending and provides in pertinent part:

"(e) If a person is simultaneously in custody upon more than one charge pending against him in the same county, or simultaneously demands trial upon more than one charge pending against him in the same county, he shall be tried, or adjudged guilty after waiver of trial, upon at least one such charge before expiration relative to any of such pending charges of the period prescribed by sub-paragraphs (a) and (b) of this Section. Such person shall be tried upon all of the remaining charges thus pending within 160

days from the date on which judgment relative to the first charge thus prosecuted is rendered pursuant to Section 118—1 of this Act or, if such trial upon such first charge is terminated without judgment and there is no subsequent trial of, or adjudication of guilt after waiver of trial of, such first charge within a reasonable time, the person shall be tried upon all of the remaining charges thus pending within 160 days from the date on which such trial is terminated; if either such period of 160 days expires without the commencement of trial of, or adjudication of guilt after waiver of trial of, any of such remaining charges thus pending, such charge or charges shall be dismissed and barred for want of prosecution unless delay is occasioned by the defendant * * *."

Day had been in custody since his arrest on March 2, 1976. At that time there were three charges pending against him: (1) theft of lost property (the Cadillac) stemming from the arrest of February 18, 1976, for which he was released on bail, and pleaded guilty to on September 2, 1976; (2) an undetermined charge, on which he was acquitted on December 15, 1976; and (3) the murder and attempt robbery charges, the subject of this appeal, on which trial commenced on March 16, 1976.

■■ There is a difference of opinion as to whether defendant was "in custody" on the theft charge since he was technically on bail for that offense. *People v. Wilson* (1974), 19 Ill. App. 3d 466, 311 N.E.2d 759, would hold that he was in custody on the theft charge, while *People v. Cooper* (1977), 56 Ill. App. 3d 354, 371 N.E.2d 987, would hold that he was not. Should it be determined that defendant was not "in custody" on the theft charge, he argues that subsection (e) still applies to his case since he simultaneously demanded trial upon more than one charge. The question is not crucial since it appears from the half sheet that defendant agreed to continue the instant matter on September 30, 1976, until November 4, 1976. Since this would be a delay attributable to defendant (*People v. Turner* (1977), 55 Ill. App. 3d 1008, 371 N.E.2d 275; *People v. Gooding* (1975), 61 Ill. 2d 298, 335 N.E.2d 769), even if the original term began on September 2 (in custody for all charges), the term had been broken and a new 160-day period began on November 4, 1976. (*People v. Donalson* (1976), 64 Ill. 2d 536, 356 N.E.2d 776.) It is therefore immaterial whether the original term began on September 2 or on December 15 since the trial in fact began within 160 days of either date. The provisions of subsection 103—5(f) (Ill. Rev. Stat. 1977, ch. 38, par. 103—5(f)) providing for a temporary suspension for the time of the delay are inapplicable to offenses committed prior to March 1, 1977. Ill. Rev. Stat. 1977, ch. 38, par. 103—5(f); *People v. Donalson.*

Defendant argues that the September 30 continuance by agreement should not be considered a delay attributable to him since the real reason

for the delay was the State's election to proceed on his second (undetermined) charge. He maintains that since it is not clear that the delay is attributable to him, this court should inquire into the circumstances surrounding the granting of the continuance to ascertain if the delay was occasioned by him. (*People v. Beyah* (1977), 67 Ill. 2d 423, 367 N.E.2d 1334.) In *Beyah*, the judge directed the setting of the trial date even though defendant sought an earlier date. It was later shown that the delay was necessary because defense counsel, the assistant State's Attorney and the trial judge were all engaged in the trial of another defendant. Under these circumstances, the supreme court decided that the delay was not occasioned by defendant.

■■ In the instant case, the delay was not necessary to accommodate the court's schedule of other trials but of defendant's other trial. We do not know what the State would have done had defendant demanded trial on September 30, but it is likely that trial would have commenced to avoid the running of the term. Defendant's agreement obviated the need for immediate trial, and the delay was, in part, attributable to him. Therefore, he should not now be able to urge that the delay was not occasioned by him. *People v. Criss* (1977), 45 Ill. App. 3d 973, 360 N.E.2d 543.

## VI.

■■ Day contends that the details of the high-speed chase on February 18, 1976, which resulted in his arrest for various unrelated offenses were improperly admitted and prejudicial to defendant's case. He does not challenge the use of the traffic arrest to link him to the car. He argues that although the prosecutor correctly asserted that evidence of flight is admissible to show consciousness of guilt (*People v. Harris* (1972), 52 Ill. 2d 558, 288 N.E.2d 385), the court must determine whether the record shows any reason for flight other than the crime for which defendant is being tried. Since the record in the instant case discloses that he was driving a stolen car, defendant attributes his flight to that offense and contends that the introduction of the testimony in his murder trial was error.

The State relies on the following language from *People v. Harris*:

"We consider next defendant's contention that the admission of the testimony of the police officers concerning defendant's efforts to avoid arrest by speeding away from the officers was prejudicial error. Citing *State v. Green* (Mo. 1951), 236 S.W.2d 298, defendant argues that the evidence of flight was inadmissible for the reason that at the time of the arrest he was being sought on an armed robbery charge and that it was his desire to avoid being apprehended on that charge that motivated his flight rather than his wish to avoid arrest while in possession of narcotics. Evidence

of flight is admissible as a circumstance tending to show consciousness of guilt. *People v. Wright*, 30 Ill. 2d 519; *People v. Autman*, 393 Ill. 262. The record does not contain evidence to show that defendant attempted to flee for any reason other than consciousness of guilt of the offense of which he was convicted. \* \* \*." (52 Ill. 2d 558, 561, 288 N.E.2d 385, 387.)

In the instant case, the State maintains that the evidence of flight is nonetheless admissible to prove the murder charge although the police were unaware of such involvement at the time of his arrest for car theft. Unlike *Harris*, evidence in the record shows that the flight here could be attributed to the car theft charge.

*People v. Ligon* (1973), 15 Ill. App. 3d 746, 305 N.E.2d 212, is a similar case. Defendant was in custody on an undetermined charge but was able to escape. He was later arrested for escape and an unrelated murder. Evidence of his escape was introduced at his trial for murder. On appeal, defendant challenged the introduction of this evidence. He argued that although it is reasonable to admit evidence of flight or escape when a defendant is in custody under one charge only, it is unreasonable when he is in custody for more than one offense, since it cannot be assumed from which charge the consciousness of guilt stemmed. The court noted that the undetermined charge had to be lesser in degree than the murder and that the defense did not offer evidence to show that the flight was for a crime other than the one of which he was convicted. The court concluded:

"\* \* \* In the absence of any defense explanation, we therefore find it reasonable to conclude that his escape and flight under those circumstances were related to the murder charge rather than whatever other unknown (to this record) charge might have been pending against him, and that the evidence thereof was properly admitted to be considered by the jury in connection with all the other facts and circumstances in evidence as tending to prove guilt. \* \* \*." 15 Ill. App. 3d 746, 751, 305 N.E.2d 212, 217.

██ Although the flight could have been attributed to the car theft as defendant contends, it is likely that the flight was related to the murder. As suggested in *Ligon*, the defense could have introduced evidence of the other charge to explain defendant's flight. Evidence of the flight was relevant to defendant's consciousness of guilt and was to be considered by the jury with all the other facts and circumstances which tended to establish guilt. In the absence of defense explanation, it is reasonable to conclude that the flight was attributable to defendant's consciousness of guilt for the murder. The Court of Appeals of New York addressed a similar argument in *People v. Yazum* (1963), 13 N.Y.2d 302, 246 N.Y.S.2d 626, 196 N.E.2d 263. The court reasoned:

"* * * To require as a matter of law that the admissibility of flight evidence depends on its unequivocal connection with guilt feelings over the particular crime charged would, therefore, operate to exclude such evidence from many cases in which it has always been regarded as admissible as a matter of course. No one disputes the general rule, as stated by Wigmore, that ambiguities or explanations tending to rebut an inference of guilt do not render flight evidence inadmissible but, rather, must be introduced as part of the defense and submitted to the jury. (2 Wigmore, Evidence [3d ed.], §276.) The suggested distinction would mean that only alternative innocent explanations of the flight are matters of rebuttal within the supposedly general rule, while the special dispensation of absolute exclusion is reserved for those who could show multiple guilt. We think there is obviously no justification for distinguishing in such a manner between an explanation urging that flight was not motivated by consciousness of guilt at all, and one which urges that it was prompted by consciousness of a different guilt. (Accord, 2 Wigmore, Evidence [3d ed.], §276, note 2.) Such a distinction not only lacks support in the principles and theory of evidence, but would create a practical preference in favor of persons who act from guilty reasons over those who act from innocent motives." 13 N.Y.2d 302, 305, 246 N.Y.S.2d 626, 628-29, 196 N.E.2d 263, 264-65.

In the absence of testimony explaining the flight, the chase could be attributed to the murder and be considered by the jury with the other evidence. We conclude that the testimony was properly admitted.

For the foregoing reasons, the judgments of the circuit court are affirmed.

Affirmed.

LORENZ and WILSON, JJ., concur.