**STATE of Missouri, Respondent,**

v.

**Derrick P. ROSS, Appellant.**

**No. WD 35175.**

Missouri Court of Appeals, Western District.

Sept. 11, 1984.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied Oct. 30, 1984.

Application to Transfer Denied Dec. 18, 1984.

Peter M. Schloss, Asst. Public Defender, Liberty, for appellant.

John Ashcroft, Atty. Gen., David C. Mason, Asst. Atty. Gen., Jefferson City, for respondent.

Before PRITCHARD, P.J., and SOMERVILLE and KENNEDY, JJ.

PRITCHARD, Presiding Judge.

By the verdict of a jury, appellant was found guilty of the Class A Felony of assault in the first degree by means of a deadly weapon. Section 565.050, Subd. 2., RSMo 1978. Upon a finding, as alleged, that appellant was a prior felony offender, the trial court sentenced him to 30 years imprisonment in the Division of Corrections, the sentence to run consecutively to previous sentences imposed in the Jackson County, Missouri, Circuit Court Case No. CR82–4095.

By Point I, appellant asserts that the trial court erred in overruling his motion to suppress the victim's pretrial and in-court identifications of appellant, and in failing to grant his motion for judgment of acquittal at the close of the trial because the victim did not have the opportunity or ability to observe the person who shot him, and his testimony was otherwise contradictory, inconsistent, and self-destructive on issues of opportunity to observe, lighting conditions and collateral observations made at the time of the shooting.

■■■ The state says that Point I was not preserved for review because appellant did not object to the admission of identification testimony during the trial. That, of course, is a general requirement, unless there was a substantial likelihood of misidentification so that reception of the evidence would amount to a miscarriage of justice and thereby be plain error. *State v. Jackson*, 657 S.W.2d 44, 45[1–6] (Mo.App. 1983). In this case, however, the general rule is not applicable because the appellant and the state agreed that in the interest of clarity and judicial economy, the trial court would take the motion to suppress along with the case. Also, when the state introduced the identification evidence, appellant's counsel informed the court that he was not waiving an objection but was preserving his motion as a matter to be taken with the case. The claim of lack of proper identification is contained in the motion for new trial. The issue is, under these circumstances, preserved for review.

On September 28, 1982, Phillip Brown, the victim, was working on the air conditioner of his car in the side driveway of his home at 6050 Swope Parkway in Kansas City, Missouri. About 11:10 p.m., he saw "a little green Dasher" moving up 61st Street toward Swope Parkway where it stopped. It then backed up on the wrong side of the street to Brown's driveway, where one of the car's occupants asked Brown whether he wanted to buy some dope, and Brown, hardly hearing him, got out of his car and came within 10 feet of the green car when another man with a shotgun told him to hold it. Brown was about 15 feet from that man, and looked at him for about 5 seconds with nothing blocking his view, and he had no trouble seeing his face, chest and the shotgun. He was on top of the window which was down, seated on the car door. Brown ducked down in front of his car, ran to his mother's car, jumped on top of it and over the fence which separated his driveway. When he got to his porch, he looked back and saw the gunman about 15 feet away (he agreed on cross-examination that this distance was 50 feet) leaning on the hood with the gun resting on it. Brown heard a shot, felt it hit him, fell down, got up, then ran into the house. He was taken to the hospital where he remained for 3 days.

As to lighting at the time, Brown testified on direct examination that there were four lights in the area, but one across the street on 61st was not working. There was a floodlight on his garage which appears from a photograph to have been about 25–30 feet from the street. There was a street light on Swope Parkway across from Brown's house, one down west on 61st Street, and a light in the yard of a preschool across the street. He testified that the lighting conditions were pretty good, he had no trouble seeing the gunman the first time, and he could see him the second time.

There was conflicting evidence of the lighting conditions at the time and place of the shooting. Appellant introduced a memorandum of Brown's testimony at preliminary hearing recording what Michael Lyons, his then counsel, heard from Brown:

"Mr. Brown stated that the only light was a street light approximately 150 feet from where the shooting took place." Brown, on cross-examination, agreed that the light across from Swope Parkway was almost blocked by a tree, that the street light down a steep hill on 61st Street was about 150 feet away, and the preschool yard light was not working when he was shot, and that the garage floodlights provided the only illumination toward his house in the absence of the preschool light. He admitted that he remained silent when his mother said that there was no light on the street without the floodlights. On redirect examination, however, he testified that the two floodlights that night "were leaning in an angle where it covers the front part of our house, my father's truck, our two cars and our backyard."

Investigating police officer, Cindy Gibson, testified for the state that the Swope Parkway light provided illumination from about 75–80 feet away; the 61st Street light was about 50 feet away; a very bright floodlight over the garage door; and a light, not a street light, on the preschool property. She could see vehicles parked in the driveway very clearly, and could see the north and south sides of the street for about 75 feet to the west and 40 feet to the east. There was enough illumination to enable Cindy to complete her report parked in the driveway without using a flashlight or a light inside her vehicle.

Public Defender's investigator, James Miller, measured the street light distances with reference to the house and driveway. The 61st Street light was about 165 feet away, with a light pole between it and the driveway, which light did not illuminate any portion of the Brown residence or driveway. A very large tree interferes with the illumination by the Swope Parkway light of the driveway area. On May 30th, apparently two days before the trial began on June 1, 1983, Miller testified that he was unable to observe the features of defense counsel who was standing at the south side of a car with its front end at the western edge of the driveway. On April 30th, there was no light in the east side of the floodlight on the garage.

■ Although there were conflicts in the evidence as to the lighting conditions at the scene of the crime and upon Brown's ability to see his assailant, those conflicts were for the jury to determine on issues of credibility, a matter which is not for review in this court. *State v. Denmon*, 570 S.W.2d 326, 327[1, 2] (Mo.App.1978). Brown's testimony, above outlined, is not as a matter of law so contradictory, inconsistent and self-destructive, as to make it inadmissible, and the trial court did not err in overruling appellant's motion for judgment of acquittal. See *State v. Wood*, 596 S.W.2d 394, 400[7–10] (Mo. banc 1980), "The court is to determine only whether the evidence is sufficient to make a submissible case, from which reasonable jurors could have found the defendant guilty as charged."

Appellant also asserts that Brown was only able to make identification of him after seeing a photographic array, and he was only able to pick out appellant from a lineup based on his observations of that array and not upon observations occurring at the time of the assault. He argues that Brown did not have an image of his assailant until Detective Mynatt showed him a second array of photographs, which contained one of appellant, which "crystalized" it in his mind. Before that time Brown had been unable to describe any particular facial feature, but had described the assailant as being a stocky, Negro male in his twenties, with a thick neck and big shoulders. There was no suggestion from Mynatt that any person in the five-man array was a suspect. Brown told him that he was sure that one photograph was his assailant but he would rather see (or hear) him in person in a lineup before he made a positive identification.

Detective Mary Brown conducted the lineup, using five men, arranged according to similar physical build and size, and appellant was the second person from the left. The only instructions Mary gave to viewers were that if any observed a subject

on the stage to put a number on an identification card. She did not tell Phillip Brown who to pick out in the lineup, although she knew that appellant was the only person in the lineup who was a suspect, and she did not emphasize him above others therein. Mary testified that to her knowledge appellant was not in any way dissimilar or grossly dissimilar from the other persons in the lineup.

As to Phillip Brown's attendance at the lineup, he testified that he recognized appellant as being the person who shot him as soon as he got onto the stage for the lineup, and he shortly later recognized his voice as being that of the person he heard on the night of the shooting, saying, "Hold it, don't move." No one told Brown anything about the men in the lineup or which one to pick out. When he saw the second set of photographs shown him by Mynatt, he picked appellant out, "that's when [he] really started getting a picture of the build, the individual who shot [him], that's when it really crystalized in [his] mind." Brown agreed that when he saw the lineup that really crystalized it in his mind, and it was not until Mynatt showed him the pictures that he really saw a description taking form in his mind. On redirect examination, however, Brown indicated that he had it in his mind what the person looked like who had the gun before he looked at the photographs and lineup.

■ As noted, there was no evidence of impermissible suggestiveness by the police at either Brown's viewing of the photographs or at the lineup, under the first step analysis of *State v. Higgins*, 592 S.W.2d 151, 159 (Mo. banc 1979). Under that case and *Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 382–383, 34 L.Ed.2d 401 (1972), the enumerated factors as to identification for consideration are here satisfied: (1) The opportunity of the witness to view the criminal at the time of the crime [Brown saw him once at 15 feet for 3 to 5 seconds, and a second time from about 50 feet when he looked over his shoulder, the lighting conditions being for the jury to determine]; (2) the witness' degree of attention [here enough to cause Brown to turn and run upon hearing "Hold it, don't move", and seeing the man with a shotgun pointed at him]; (3) the accuracy of the witness' prior description of the criminal [although Brown could not describe the facial characteristics to police, he did have that aspect in his mind, and did give the age and general stocky build of the assailant]; (4) the level of certainty demonstrated by the witness at the confrontation [Brown was sure that appellant was in the second array of photographs shown to him. He picked out appellant immediately as he went on the stage, and verified his voice]; (5) the length of time between the crime and the confrontation [here only 14 days elapsed]. Furthermore, Brown likewise positively identified appellant as his assailant at the trial. Under the totality of the circumstances, *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967), the evidence provides a sufficient basis of reliability of the identification. Point I is overruled.

■ On cross-examination, several prior inconsistent statements of Phillip Brown were brought out: That he had said the car was light yellow; its location on the street at the time of the crime; that the assailant had a white patch over his eye; that he informed defense counsel that the identification was not real positive; that he was silent in his mother's presence when she said there was no light on the street without the floodlights; and that he testified on preliminary hearing that the only lighting at the time of the assault was a street light 150 feet away. The state did not then object or then request a limiting instruction as to the jury's consideration of the prior, inconsistent statements only as to the weight and believability of his testimony in accordance with MAI–CR 3.52. The trial court, however, did instruct the jury on the subject in Instruction No. 9, patterned after MAI–CR 3.52, at the close of the case.

Appellant says it was error to give Instruction No. 9 because there were no objections or limiting instruction made or given *at the time* the impeaching evidence

was received, and thus that evidence was entitled to be considered by the jury for all purposes, including that of the guilt or innocence of appellant. He cites *State v. Nimrod*, 484 S.W.2d 475 (Mo.1972), but that case does not support his proposition. There, the *defendant* offered a limiting instruction, patterned after MAI–CR 3.52, on the jury's consideration of notes taken down of a witness' preliminary hearing testimony, which instruction was refused. The court noted the broad comment of the committee under MAI–CR 3.52, but held that there was no error because the preliminary hearing evidence was not of an impeaching nature. *State v. Beedle*, 619 S.W.2d 334 (Mo.App.1981), is also cited, but there a MAI–CR 3.52 instruction was given with others after the close of the case, and the reversal turned upon improper comments on the evidence by the trial court.

The Nimrod and Beedle cases do not control the issue presented under Point II. Rather, in the factual analagous case of *State v. Laws*, 661 S.W.2d 526, 530[5] (Mo. banc 1983), the court ruled as proper the giving of a MAI–CR 3.52 instruction as a part of the general charge, at the conclusion of the evidence, the court saying, "We are not prepared to accept the proposition that the court erred in giving the limiting instruction at a later time, simply because it was not requested or given at the time the impeaching evidence was offered. The limitation was as logical at the conclusion of the case as at any other time. * * * The defendant did not acquire a right to have the evidence considered beyond its proper purpose simply because there had been no contemporaneous attempt at limitation." Point II is overruled.

■ Detective William Mynatt was asked on direct examination about photographs shown to the victim, Phillip Brown. Mynatt was asked what kind of individuals were in the photographs, and he answered, "They were police mug shots of robbery suspects." Defense counsel immediately requested a mistrial upon the ground that the answer placed into evidence other crimes which was highly prejudicial to appellant, and it was not responsive to the state's question. The trial court denied the request for mistrial, but upon further request of defense counsel, instructed the jury to disregard the volunteered answer about mugshots, and ordered it stricken from the record. Although the use of the term "mug shots" has been disapproved in criminal proceedings, *State v. Rutledge*, 524 S.W.2d 449, 458[11, 12] (Mo.App.1975), it has been held also that whether that allusion requires the drastic remedy of a mistrial is within the discretion of the trial court, which will not be disturbed unless there is an abuse thereof. *State v. Harris*, 534 S.W.2d 516, 519 (Mo.App.1976). Mynatt's statement did not imply that appellant was a robbery suspect. It was spontaneous by the witness, and made only briefly. The trial court's action in instructing the jury to disregard the statement must be deemed to be a sufficient corrective action in removing any possible prejudice to appellant. Compare *State v. Head*, 631 S.W.2d 700 (Mo.App.1982), where the court refused a request for mistrial but offered to instruct the jury to disregard a reference to "mug shots", which was declined, the court holding there was no abuse of discretion. Point III, raising this issue, is overruled.

On October 12, 1982, about two weeks after the assault on Phillip Brown, officers Hurn and Mulloy, armed with search and arrest warrants for stolen property, went to a house at 5911 Olive Street in Kansas City to look for appellant. After being admitted to the house and searching it, they found appellant hiding under a couch upon which two other individuals were sitting. Appellant says in Point IV that this evidence was inadmissible as not being relevant to any issue of "consciousness of guilt"; it was remote in both time and location; and was an arrest solely on an unrelated charge, and had no bearing, whatsoever, on the issues tried.

■ Just prior to the receipt of the "concealment" evidence, appellant's counsel renewed his motion in limine again requesting that the evidence be excluded. The

state says that Point IV is not preserved for review because appellant did not object to the testimony when it was offered at trial, but it would seem that the renewal of the matter in the motion in limine was sufficient to apprise the trial court of an objection to it. If the motion is insufficient to preserve the point, it may be considered as a matter for application of the plain error rule.

Appellant acknowledges that the law of this state *strongly* supports the rule of admissibility of evidence of flight or concealment as being probative on the issue of consciousness of guilt, as set forth in *State v. Campbell,* 533 S.W.2d 671, 675[1] (Mo.App.1976), and cases cited. Appellant cites *State v. Green,* 236 S.W.2d 298, 299[1] (Mo.1951), for an exclusionary rule where a defendant, under two or more distinct charges, breaks jail and escapes, and its rationale, "The reason usually given for the exclusionary rule is that it is impossible to determine from which charge the defendant may have escaped and fled, he may have fled because conscious that he was guilty of the charge for which he was not on trial. *State v. Crawford,* 59 Utah 39, 45, 201 P. 1030." The Green court held that there was no reason to apply the exclusionary rule because defendant admitted that he "broke jail" and fled because of the charge of robbery for which he was on trial. In any event, in *State v. Tyler,* 306 S.W.2d 452, 459[10] (Mo.1957), noted that the Green case did not hold that the exclusionary rule there mentioned was the law in Missouri, nor was there any approval of the rule. The Tyler court said, "We are of the view that the cases wherein that rule has been applied have confused the admissibility of evidence with the weight to be given by a jury to the evidence adduced as to the circumstances of defendant's confinement and escape when he is confined on two or more charges at the time." The court went on to say that unless the trial court declares as a matter of law that the evidence is insufficient, whether an escape shows a consciousness of guilt of the offense on trial is a jury question. Note also *Commonwealth v. Madeiros,* 255 Mass. 304, 314, 151 N.E. 297, 299[6] (1926), and other cases cited in Tyler. See also *People v. Day,* 76 Ill.App.3d 571, 32 Ill.Dec. 39, 50, 394 N.E.2d 1378, 1389 (1979), holding that in the absence of defense explanation, evidence of a defendant's flight could have been attributable to his consciousness of guilt for murder, rather than as contended attributable to a car theft, and the comment therein from *People v. Yazum,* 13 N.Y.2d 302, 246 N.Y.S.2d 626, 628–629, 196 N.E.2d 263, 264–265 (1963), on the admissibility of flight where there are multiple charges. The "concealment" was but two weeks after the assault, so it could not have been too remote as a matter of law. Point IV is overruled.

In his last point, appellant contends that the trial court erred in overruling his objection to the state's cross-examination of his witness, Michael Lyons, which he says improperly exceeded the scope of his direct examination, which was on the subject of the preliminary hearing. The state confined its examination of events occurring at that time to test Lyons' memory of them, except as to whether he remembered appellant having tried to trip Phillip Brown. That question was obviously innocuous, but in any event, the scope of cross-examination is within the discretion of the trial court, the exercise of which will not be disturbed absent a clear showing of abuse. *State v. Brown,* 624 S.W.2d 543, 545 (Mo.App.1981). Point V is overruled.

The judgment is affirmed.

All concur.